UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------    X
                                                                       :
UNITED STATES OF AMERICA,                                              :         20-CR-285 (ARR) (VMS)
                                                                       :
            v.                                                         :
                                                                       :         **ORDER ADOPTING**
DASHAWN ANDREWS,                                                       :         **REPORT AND**
                                                                       :         **RECOMMENDATION**
                        *Defendant*.                                   :
                                                                       :
-------------------------------------------------------------------    :
                                                                       X


BREON S. PEACE
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, NY 11201
By:     Joy M. Lurinsky
        John Vagelatos
        Alexander Mindlin
*Attorney for the Government*


FEDERAL DEFENDERS OF NEW YORK, INC.
One Pierrepont Plaza – 16th Floor
Brooklyn, NY 11201
By:     Leticia M. Olivera
        Evan Sugar
*Attorneys for Defendant*

ROSS, United States District Judge:

Presently before the Court is a Report and Recommendation ("Report") issued by Magistrate Judge Vera M. Scanlon on April 1, 2022, recommending that the Court grant defendant Dashawn Andrews's motion to suppress the firearm seized during a stop-and-frisk, as well as his post-arrest statements. Dkt. No. 106. The government objects to three factual findings in the Report. For the following reasons, the Report is affirmed in its entirety, and Mr. Andrews's motion to suppress the evidence and his post-arrest statements is granted.

## BACKGROUND

While familiarity with the Report is assumed, I highlight a few key details below for the ease of the reader.

At the suppression hearing before Judge Scanlon, Officer Schumacher testified that he observed Mr. Andrews crossing the street in a crosswalk sometime after 1:00 am. When Officer Schumacher and the car came abreast with Mr. Andrew, he leaned over the vehicle's center console and looked at Mr. Andrews from a direct right angle across Officer Vitale. Tr. 105:4−12, 150:24−151−3 (Schumacher). Officer Schumacher testified that he noticed a bulge in Mr. Andrews's waistband, which he followed "through the back passenger window, all the way until Mr. Andrews reached the back pillar of the car." Tr. 110:4-8 (Schumacher). Notably, Officer Vitale, who was seated closer to Mr. Andrews and not driving the car, immediately looked for a bulge but could not see one. Tr. 8:21-9:6, 47:2-6, 47:22-48:1 (Vitale).

Officer Schumacher proceeded to stop the car at the end of the block so that the officers could observe Mr. Andrews standing on the sidewalk. Tr. 8:21-9:6 (Vitale). Officer Vitale testified that he saw Mr. Andrews put his entire forearm up to his elbow under his waistband and inside his pants, which he demonstrated for the Court. On the date of the incident, however, Officer Vitale

wrote in a report that Mr. Andrews was observed "adjusting his waistband." Tr. 60:21-25, 63:25-64:10 (Vitale). About two weeks after the incident, Officer Vitale described the hand motion like that of "tucking in a shirt." Tr. 63:22-24 (Vitale).

After exiting the police car, Officer Vitale approached Mr. Andrews alone, while Officer Schumacher and Officer McCurry searched for a possibly discarded firearm. Tr. 120:18-121:1, 207:11-25 (Schumacher). Officer Vitale testified that he began frisking Mr. Andrews at his upper chest, rather than between his legs where he allegedly suspected the gun might be, to keep the situation calm. Tr. 19:13-24, 74:11-19 (Vitale). Officer Schumacher testified that when Officer Vitale found the gun in Mr. Andrews's pants, he called Officer Schumacher's name in a "frantic" manner. Tr. 123:25-11 (Schumacher).

**LEGAL STANDARD**

A district court judge may designate a magistrate judge to conduct hearings and to submit to the Court proposed findings of fact and a recommendation as to the disposition of a motion to suppress. *See* 28 U.S.C. § 636(b)(1). Within 14 days of service of the recommendation, any party may file written objections to the magistrate's report. *See id*. Upon *de novo* review of those portions of the record to which objections were made, the district court judge may affirm or reject the recommendations. *See id*; *United States v. Raddatz*, 447 U.S. 667, 681–82 (1980) ("[T]he magistrate's proposed findings and recommendations shall be subjected to a *de novo* determination by the judge who . . . then exercise[s] the ultimate authority to issue an appropriate order." (internal quotations and citation omitted)). The Court is not required to review, under a *de novo* or any other standard, the factual or legal conclusions of the magistrate judge as to those portions of the report and recommendation to which no objections are addressed. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985).

2

The government timely objected to the Report, and Mr. Andrews timely replied.(Dkt. Nos. 111 & 113.

## DISCUSSION

The government objects to three factual findings in the Report: (1) Officer Schumacher could not see Mr. Andrews well enough to make out the alleged bulge in Mr. Andrews's waistband; (2) none of the officers could see the suspicious hand motion Mr. Andrews allegedly made; and (3) Mr. Andrews's behavior was not nervous or evasive.

With respect to the first two findings, the government claims its evidence shows that the officers observed Mr. Andrews at an adequately close distance, in well-lit areas, with an unobstructed view, and with sufficient time to see the bulge and the hand motion. In addition, it challenges the Report's adverse credibility findings against the officers who testified at the suppression hearing. The government contends that, by failing to adopt the perspective of a reasonable police officer, the Report erroneously concluded that the officers would have used different tactics if they had truly observed the bulge and the hand motion. Instead, the government argues, the Report should have credited the officers' explanation that Officer Vitale approached Mr. Andrews alone and began the frisk at his chest to avoid tipping Mr. Andrews off that the officers knew he had a firearm. Furthermore, it contends that the Report unreasonably expected the officers to recall precise details about the stop nineteen months after the incident and drew adverse inferences based on variations in their recollections of that night. At the same time, the Report minimized corroboratory evidence, given that the officers' testimony about the bulge and hand motion was consistent with where the gun was found.

Finally, the government argues that its evidence shows that Mr. Andrews's behavior—looking around while slowing down, stopping behind a fence, and walking in the opposite

3

direction—was nervous and evasive, and therefore contributed to the officers' reasonable suspicion.

In making the foregoing objections, the government repeats many of the arguments made to and considered by the magistrate judge. *See* Dkt. Nos. 94 & 98. Although some courts review previously asserted arguments for clear error, *see Manzanares v. Your Favorite Auto Repair & Diagnostic Ctr., Inc.*, No. 17-CV-5001 (MKB), 2020 WL 6390162, at *3 (E.D.N.Y. Nov. 2, 2020), *appeal dismissed* (Mar. 17, 2021) (collecting cases), I will review the government's objections under the *de novo* standard mandated by 28 U.S.C. § 636(b). *See id.* (conducting *de novo* review out of an abundance of caution).

Based on the body-camera footage and photographs from the night of the arrest, I conclude that the government's evidence supports the finding that the officers would have been incapable of observing either the bulge or the hand motion. The government's photographs show that Mr. Andrews was wearing a dark-colored sweatshirt underneath an unzipped black track jacket. Exhs. 3, 4, 5. Notably, the track jacket and sweatshirt hung over Mr. Andrews's waistband, and his sweatshirt, which was not flush with his body, had a scarf tucked underneath. Exhs. 2.2, 3, 4, 5; Tr. 18:9-19:17 (Vitale), 111:9-24 (Schumacher). Accordingly, a bulge caused by a small firearm would not have been visible to an observer while Mr. Andrews was walking at night—especially to an observer who was driving a vehicle and had limited time to look out the passenger-side window. Tr. 105:4-12, 150:24-151:3 (Schumacher). Even accepting the government's characterization of the crosswalk where Mr. Andrews was observed as "well-lit," I find that Officer Schumacher would not have been able to see a bulge under these conditions.

Similarly, the officers would not have been able to observe, from at least 168 feet away, Mr. Andrews's hand motion while he stood behind a wrought-iron fence in a poorly lit area.

Photographs and body-camera footage depict the area where Mr. Andrews was standing enveloped in dark shadows, despite the presence of lights in the vicinity. Exhs. 2.2, 2.3, J.3-J.5. Even if no other objects had obstructed the officers' view, as the government contends, the officers would not have been able to see Mr. Andrews making the alleged hand motion.

Given these conclusions, I find no reason to depart from the Report's adverse credibility findings. Officer Vitale's decision to approach Mr. Andrews alone and begin the frisk at Mr. Andrews's chest is consistent with the Report's conclusion that none of the officers believed that Mr. Andrews had a gun. Moreover, Officer Schumacher's decision to wait for confirmation of a discarded firearm from Officer McCurry rather than assist Officer Vitale during the frisk, Tr. 120:18-121:1, 124:1-5, 207:14-17, 210:3-11 (Schumacher), belies Officer Vitale's purported suspicion that the firearm was in Mr. Andrews's pants, Tr. 19:19-24 (Vitale). Moreover, Officer Vitale's "frantic" response upon discovering the firearm contradicts his claim that he believed the firearm was located between Mr. Andrews's legs. Tr. 123:25-11 (Schumacher).

The government's rationale for why the officers did not move directly for the gun—to prevent Mr. Andrews from learning that they knew he had a firearm—is unpersuasive. Once Officer Vitale stopped Mr. Andrews and began the frisk, Mr. Andrews would have been tipped off that the officers had reasonable suspicion that he was armed. As such, the officers' testimony regarding their police tactics is unavailing.

In addition, the Report's adverse credibility determinations were "appropriately based upon inconsistent statements, contradictory evidence, and inherently improbable testimony." *Diallo v. I.N.S.*, 232 F.3d 279, 287–88 (2d Cir. 2000). At the suppression hearing, Officer Vitale provided an embellished description of Mr. Andrews's hand motion that significantly varied from his prior descriptions. *See* Tr. 60:21-25, 63:22-64:9 (showing that Officer Vitale previously

described Mr. Andrews as "adjusting his waistband," and later, "tucking in his shirt"). Meanwhile, the officers were unable to recall whether they had communicated to each other their purported observations of Mr. Andrews's hand motion prior to stopping Mr. Andrews. Though I recognize that the passage of nineteen months may account for the officers' inability to recall precise details, I find Officer Schumacher's explanation that he "assumed that they were looking at the same thing," Tr. 138:20-22 (Schumacher), implausible given the poor visibility and the ambiguity of the hand motion allegedly observed. I thus concur with the Report's conclusion that "it defies logic that the officers would stop and frisk someone they suspected was armed while keeping each of their individual observations about the threat posed secret from one another." Dkt. No. 106.

The government's argument that the Report minimized corroboratory evidence is also meritless. The officers' testimony at the suppression hearing is not made more reliable simply because it is consistent with where the gun was earlier recovered. Nor does the officers' decision to stop the car and observe Mr. Andrews, by itself, prove that their suspicion was reasonable at that time or later.

Finally, from a review of Officer Vitale's body-camera footage before he approached Mr. Andrews, I find that Mr. Andrews did not move hurriedly on the sidewalk. Rather, he stepped calmly toward Officer Vitale to answer his questions. Exh. 2.2. I thus adopt the Report's finding that Mr. Andrews's behavior was neither nervous nor evasive.

## CONCLUSION

After *de novo* review, the Court concurs with Judge Scanlon's findings and accepts her well-reasoned recommendations. Accordingly, the Report, which is appended to this order, is affirmed in its entirety.  Mr. Andrews's motion to suppress the evidence and his post-arrest statements is granted.

6

SO ORDERED.

_____/s/_____

Allyne R. Ross
United States District Judge

Dated:        June 27, 2022
              Brooklyn, New York

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
UNITED STATES OF AMERICA,      :
        :
   -against-        :
        :
DASHAWN ANDREWS,        :
        :
   Defendant.        :
        :
------------------------------------------------------------ x

**PROPOSED FINDINGS OF FACT**
**AND RECOMMENDATIONS**

20 Crim. 285 (SJ) (VMS)

**Vera M. Scanlon, United States Magistrate Judge:**

Defendant Dashawn Andrews ("Mr. Andrews") is charged with being a felon in

possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  See ECF No. 1.

New York Police Department ("NYPD") Officers William Schumacher, Michael Vitale and

Matthew McCurry found the gun in question on Mr. Andrews's person during a warrantless stop

and frisk and, after Mr. Andrews's arrest, a grand jury returned a one-count indictment charging

that Mr. Andrews, knowing that he had previously been convicted in a court of a crime

punishable by a term of imprisonment exceeding one year, did knowingly and intentionally

possess in and affecting commerce a firearm, as well as ammunition, in violation of 18 U.S.C. §§

922(g)(1), 924(a)(2) and 3551 et seq.  See ECF No. 1.

Mr. Andrews filed a motion alleging that the officers had unlawfully stopped and frisked

him without reasonable suspicion and requesting suppression of the firearm seized during the

encounter as well as of post-arrest statements that Mr. Andrews made to law enforcement.  See

ECF No. 14.  The Government opposed, see ECF No. 16, and Mr. Andrews replied and

supplemented, see ECF Nos. 20, 22.  The Honorable Sterling Johnson referred Mr. Andrews's

motion to suppress for proposed findings of fact and recommendations.  See 28 U.S.C. §§

636(b)(1)(A)-(B); United States v. Raddatz, 447 U.S. 667 (1980) (holding that motion to

suppress may be referred to a magistrate judge subject to <u>de novo</u> review by the district court).

After the parties' litigation of discovery disputes were resolved, this Court held a two-day

suppression hearing in connection with Mr. Andrews's suppression motion. <u>See</u> Dkt. Entry

12/6/2021; Dkt. Entry 12/7/2021; ECF Nos. 93, 103-04. The Government filed a post-hearing

brief in further opposition to the motion. <u>See</u> ECF Nos. 94-95. Mr. Andrews filed a post-

hearing brief in further support of his motion, <u>see</u> ECF No. 96, and the Government replied, <u>see</u>

ECF No. 98.

      For the reasons that follow, I respectfully recommend that the District Judge grant Mr.

Andrews's motion in its entirety.

## I.    Facts

      The following factual summary is derived as cited from testimony received by the Court

during the suppression hearing from the Government's witnesses Officer Schumacher, Officer

Vitale and Officer McCurry; Mr. Andrews's witness Waleska Miller; and the parties' admitted

exhibits. <u>See</u> Dkt. Entry 12/6/2021; Dkt. Entry 12/7/2021.[1]

### a.  Descriptive Information

#### i.  Relevant NYPD Procedures

      Prior to the date in question, the three officers had received training as to where people

tend to carry firearms and had experience finding firearms in connection with stops and arrests.

---

[1] This Court will hereinafter cite to the transcript for the two-day suppression hearing as "Tr. [page number]:[line number]. ([witness name])." <u>See</u> ECF Nos. 103-04. It will refer to the parties' admitted exhibits using the Government's numeric identifiers and Mr. Andrews's alphabetical identifiers. Government Exhibits 3-5, 9-10, 15, 21-24 and Defense Exhibits J.1-J.5, J.7-J.13 and K are available on the docket at ECF No. 93. Government Exhibit 1 is the physical firearm retrieved during the stop and frisk. <u>See</u> Exh. 1 (firearm). Government Exhibits 2.2-2.4 are video exhibits of the officers' body-camera footage; they were delivered to Chambers in native format but were not filed on ECF due to technical limitations. <u>See</u> Exhs. 2.2 (Vitale body-camera footage), 2.3 (Schumacher body-camera footage), 2.4 (McCurry body-camera footage).

See Tr. 4:25-5:24 (Vitale), 91:10-93:7 (Schumacher), 226:7-23 (McCurry). Each of the officers

had years of law enforcement experience, including stops and arrests of individuals with

firearms. See Tr. 4:8-10, 5:20-24 (Vitale), 90:14-18, 92:4-93:7 (Schumacher), 225:10-12,

226:21-23 (McCurry). Officer Vitale testified that due to the dangers involved when dealing

with someone suspected of carrying a firearm, it is police practice to provide fellow officers with

whatever information the officers need so that they can be aware and protect themselves. See Tr.

44:7-21 (Vitale).

All three officers were wearing body cameras at the time of the incident, footage from

which was admitted in evidence. See Tr. 25:17-26:8 (Vitale); Exh. 2.2 (Vitale body-camera

footage); Tr. 126:14-127:9 (Schumacher); Exh. 2.3 (Schumacher body-camera footage); Tr.

236:9-23 (McCurry); Exh. 2.4 (McCurry body-camera footage). Officer Schumacher testified

that body-camera footage is recorded as "slightly darker" than actual lighting conditions so that

"it doesn't catch anything that the human eye wouldn't catch." Tr. 138:6-10 (Schumacher).

Under NYPD procedures, although a body camera is always recording, its footage is not

preserved until an officer activates the device, whereupon the previous thirty (30) seconds of

video footage is saved and an audio recording begins. See Tr. 27:16-28:1, 82:19-83:12 (Vitale),

128:5-16, 180:22-181:3 (Schumacher), 237:10-16 (McCurry). Officer Schumacher testified that

the relevant model of body camera had a large "toggle switch" that an officer would swipe down

to activate it. See Tr. 202:3-8 (Schumacher). On cross-examination, Officer Schumacher further

testified that the swipe to activate the body camera would take seconds except in the case of an

imperfect swipe which would require additional effort. See Tr. 215:13-24 (Schumacher). All

three officers testified that they were each aware that they were required to activate the body

camera prior to engaging with someone suspected of criminal activity, for example, before

3

searching such an individual.  <u>See</u> Tr. 66:3-67:1 (Vitale), 180:8-12, 182:9-15 (Schumacher), 243:19-25 (McCurry).[2]

> ### ii.  The Officers' Routine Patrol In Plainclothes And In An Unmarked Car

Late on the evening of May 13, 2020, going into May 14, 2020, Officer Schumacher, Officer Vitale and Officer McCurry were working as members of an anti-crime unit of the 75th Precinct in Brooklyn, New York.  <u>See</u> Tr. 4:19-24 (Vitale), 90:16-18 (Schumacher), 225:23-226:6 (McCurry).  They were en route to no particular location and following no particular route when performing a routine patrol in plainclothes and in an unmarked police vehicle while looking for felony crimes in progress.  <u>See</u> Tr. 5:25-6:21 (Vitale), 94:9-11, 97:11-17 (Schumacher).

Officer Schumacher was driving the unmarked vehicle.  <u>See</u> Tr. 45:10-11 (Vitale), 97:9-10 (Schumacher).  Officer Vitale was sitting in the front passenger seat, and Officer McCurry was sitting in the rear seat behind Officer Schumacher.  <u>See</u> Tr. 6:15-19, 45:4-11 (Vitale), 94:13-15, 97:9-10 (Schumacher).  At the time, Officer Schumacher was driving the vehicle slowly—typical patrol speed is approximately 10 to 15 miles per hour—to permit the officers to fully observe activity around them and to react more quickly in the event their response to an incident was needed.  <u>See</u> Tr. 6:25-7:13 (Vitale), 104:11 (Schumacher), 227:6-8 (McCurry).  In addition, the vehicle's windows had been lowered to permit the officers better visibility.  <u>See</u> Tr. 7:14-18

---

[2] Mr. Andrews's post-hearing brief purported to attach NYPD Patrol Guide 212-123 as further evidence showing the nature of this recording requirement but appears to have a different document attached in error.  <u>See</u> ECF No. 96 at 7 n.6; ECF No. 96-1.  Given that the testimony sufficiently establishes this point, and in light of the fact that this Court's analysis does not turn on the officers' failure to activate their body camera in the events discussed herein, the Court did not request further clarification.

(Vitale), 98:13-20 (Schumacher).[3]

### iii. General Layout Of The Incident Scene

The following graphic, which this Court will cite as Figure 1, is a simplified version of a map admitted in evidence for the limited purpose of generally showing the area between Livonia Avenue's northeast corner with Pennsylvania Avenue and Livonia Avenue's northeast corner with Sheffield Avenue where events relevant to the incident took place.  See Tr. 258:13-259:22 (Miller); Exh. K.  The graphic is offered here for context for the instant motion.  The graphic is not drawn to scale.  This Court has added Points A-D to Figure 1 which its factual summary will reference with supporting evidence where that may be helpful.



For initial summary orientation, the evidence discussed below was admitted subject to limitations[4] for its general depiction of relevant layouts and lighting conditions pertaining to certain points on the graphic.  See Sections I.a.iv-vi., infra.  This Court will cite more directly to

---

[3] Although Officer Vitale's body-camera footage from approximately four minutes after Mr. Andrews's stop appears to show that the rear passenger-side window was closed as Officer Vitale got back into the vehicle to travel to the precinct and that the front passenger-side window was partially closed, this Court does not find this material to the instant motion because there is no evidence in the record as to when the windows were closed.  See Exh. 2.2 at 1:23:08-1:23:12, 1:23:32-1:24:08 (Vitale body-camera footage).

[4] As noted in testimony and rulings, such limitations include that lighting conditions shown and transient objects appearing (including people) were or may have been different than at the time of the incident at issue.

this and other visual evidence, including officer body-camera footage, in other parts of its factual summary as well.  <u>See</u> Section I.b, <u>infra</u>.

### iv.  The Intersection Of Livonia And Pennsylvania Avenues

First, photographs in evidence depict Livonia Avenue's northeast corner with Pennsylvania Avenue, which is the location where Officer Schumacher first noticed Mr. Andrews and the incident began.  <u>See</u> Figure 1, Point A; Exhs. 21-22, J.11; Section I.b.i, <u>infra</u>.  In evidence is a northbound-oriented photograph of the crosswalk spanning the northeast and northwest corners of Livonia and Pennsylvania Avenues.  <u>See</u> Figure 1, Points A-B, respectively; Tr. 260:1-263:3 (Miller); Exh. J.12.[5]  The photograph was taken from the middle of the intersection, which is the location where Officer Schumacher allegedly observed a bulge in the front of Mr. Andrews's waistband as Officer Schumacher drove the unmarked vehicle past Mr. Andrews.  <u>See</u> Tr. 260:1-263:3 (Miller); Section I.b.ii, <u>infra</u>.  Officer Schumacher and Officer McCurry testified that although it was at night when the incident took place, the intersection was "well-lit" by ambient light from the subway station that runs above Livonia Avenue, trains, street lamps, stores and vehicles.  Tr. 105:13-21 (Schumacher), 228:15-18 (McCurry).  While reviewing his body-camera footage taken from the sidewalk slightly west of the intersection's northwest corner, Officer Schumacher testified about four to five specific sources of such light coming from the elevated train station above and about at least one source coming from a store on the south side of Livonia Avenue.  <u>See</u> Tr. 128:21-129:21, 133:9-21 (Schumacher); Exh. 2.3 at 1:19:35, 1:20:13

---

[5] This photograph of a northbound view of the crosswalk taken from the middle of the intersection was admitted with the limitation that no conclusions could be drawn from the person in the photograph regarding Officer Schumacher's claimed observations of Mr. Andrews.  <u>See</u> Tr. 262:9-263:2 (Miller).

(Schumacher body-camera footage).[6]  Other body-camera footage of the intersection taken from the same sidewalk area shows that there was ambient light at the sidewalk and at the intersection, although it was not particularly bright.  See Exh. 2.2 at 1:18:50-19:00, 1:21:41-1:22:46 (Vitale body-camera footage); Exh. 2.3 at 1:19:35 (Schumacher body-camera footage).  Officer Vitale's body-camera footage in particular captures the Livonia/Pennsylvania crosswalk within its frame for approximately one minute and shows dim ambient light.  See Exh. 2.2 at 1:21:40-1:22:46 (Vitale body-camera footage).  Although there are street lights near the crosswalk, an expanse of the train station directly above the crosswalk is devoid of any overhead lights, and its shadows appear to generally darken the area.  See Exh. 2.2 at 1:21:40-1:22:46 (Vitale body-camera footage).  It should also be noted that, although the Government's exhibits of this area include open and well-lit stores on both the northeast and northwest corners of Livonia and Pennsylvania Avenues, body-camera footage shows that these commercial establishments were shuttered and dark at the time of the incident.  Compare Exh. 2.2 at 1:18:53-1:19:00, 1:21:40-1:22:46 (Vitale body-camera footage), with Exhs. 9, 15.  Thus, the body-camera footage, rather than the Government's exhibits, offers the better perspective of the lighting conditions at the relevant time.

---

[6] This Court notes that, in the Government's post-hearing brief, it supports its argument that the area was well-lit with screen shots from Officer Schumacher's body-camera footage from moments where the camera is pointing directly into certain discrete sources of light which, from that angle, have the appearance of bright starbursts.  See ECF No. 94 at 2; ECF No. 94-1; see also Exh. 2.3 at 1:20:14, 1:20:29 (Schumacher body-camera footage).  Although a discrete source of light may appear bright when the camera is directly focused on the light source, the more relevant visual evidence is that which shows the ambient lighting conditions at locations relevant to the officers' alleged observations (taking into account Officer Schumacher's testimony that the body-camera footage was "slightly darker" than what the human eye would have seen at the scene).  Tr. 138:6-10 (Schumacher).

**v. Two Wrought-Iron Enclosures And A Roll-Down Gate On Livonia Avenue's North Sidewalk Between Pennsylvania And Sheffield Avenues**

Second, photographs and body-camera footage in evidence show a roll-down gate and two wrought-iron enclosures (one lower one that appears to surround a cellar door, and one higher one that appears to surround a door leading from the sidewalk into the building) that are on Livonia Avenue's north sidewalk between Pennsylvania Avenue and Sheffield Avenue, two storefronts west of Livonia Avenue's northwest corner where Livonia intersects with Pennsylvania Avenue.  See Figure 1, Point C; Tr. 10:18-24 (Vitale); Exh. 2.2 at 1:18:52-1:23:00 (Vitale body-camera footage); Exh. 2.3, passim (Schumacher body-camera footage); Exh. 2.4, passim (McCurry body-camera footage); Exhs. 9-10, 15, 23-24, J.7.  Mr. Andrews is said to have approached then stood against the roll-down gate to the east of the wrought-iron enclosures.  See Figure 1, Point C; Section I.b.v, infra.  At the time, the officers were allegedly making observations of Mr. Andrews from their car, which they had by that time stopped on the northeast corner of Livonia and Sheffield Avenues.  See Figure 1, Point D; Sections I.b.iv-vii, infra.  Officer Vitale testified that, although it was "dark out," there was a "significant amount of ambient light" in this area of the sidewalk coming from the train station, various stores and streetlights scattered around the area.  Tr. 15:17-23 (Vitale).  Although evidence shows the area to have had some ambient light at the time of the incident, the photographic exhibits show this area of the sidewalk by the enclosures to be dimly lit.  See Exh. 2.2 at 1:18:54 (Vitale body-camera footage); Exh. 2.3 at 1:19:34 (Schumacher body-camera footage); Exh. 2.4 at 1:19:41 (McCurry body-camera footage); Exhs. J.3-J.5.

**vi. The Intersection Of Livonia And Sheffield Avenues**

Third, there are photographs in evidence taken from the northeast corner of Livonia and

Sheffield Avenues showing the officers' eastbound view of Livonia Avenue's northern sidewalk looking toward the direction of the intersection of Livonia and Pennsylvania Avenues. See Figure 1, Point D; Sections I.b.iv-vii, infra. These photographs show the vantage point from which the officers allegedly made certain observations of Mr. Andrews as he stood against the roll-down gate on the far side of the wrought-iron enclosures. See Tr. 61:20-62:3 (Vitale), 157:9-161:5 (Schumacher); Exhs. J.3-J.5. Officer Schumacher testified while looking at Exhibit J.3 that the corner space in the forefront of the photograph may have had different and possibly brighter lights inside the building at the time of the incident. See Tr. 157:18-160:11 (Schumacher). Even if the interior of the corner building were brighter than as seen in the photographs, the sidewalk area to the east of the wrought-iron enclosures on the far side of the red awning are shown in the photographs as dimly lit. See Tr. 61:20-62:3 (Vitale), 157:9-161:5, 161:18-22 (Schumacher); Exhs. J.3-J.5; Figure 1, Point D.

Defense investigator Waleska Miller testified that, based on measurements she took at the scene, the distance between the curb at Livonia and Sheffield Avenues, approximately the point from which the officers made their observations from the stopped car, and the far edge of the wrought-iron enclosures where Mr. Andrews was standing by the roll-down gate was approximately 168 feet. See Tr. 263:4- 265:19 (Miller); Exhs. 10, 15, J.3-J.5; Figure 1, Points C-D.[7] Officer Schumacher testified that he had a "pretty good view" of Livonia Avenue's north sidewalk while looking eastbound from the stopped car on the corner of Livonia and Sheffield Avenues, and of Mr. Andrews as he stood on the far side of the wrought-iron enclosures. Tr.

---

[7] The Government did not present evidence that contradicts the approximate 168-foot measurement so this Court treats it as a fact. See, e.g., Tr. 162:24-163:10 (Schumacher), 285:22-23 (Government counsel representing that Officer McCurry had not measured the distances at the scene).

116:10-14, 119:9-12 (Schumacher); Exhs. J.3-J.5.  In this regard, Officer Schumacher testified

that his sightline from the corner to Mr. Andrews at the time was unobstructed by any transient

items such as trash cans, and that if there were any garbage bags near or within the wrought-iron

enclosures, they were at ground level.  See Tr. 116:15-117:6, 119:9-12, 192:8-19 (Schumacher).

On cross-examination, when Officer Schumacher was asked whether trash cans stood between

the officers and Mr. Andrews in addition to the wrought-iron enclosures from the officers'

vantage point at the intersection of Livonia and Sheffield Avenues, Officer Schumacher testified

that he could not "remember either way" if trash cans were there at the time or, if they were,

their position.  Tr. 139:23-140:24, 146:10-147:5, 164:4-24 (Schumacher); Exhs. 15, J.7.  Officer

Vitale testified that he could not recall whether a chair obstructed his sightline from the

Sheffield/Livonia corner to Mr. Andrews.  See Tr. 14:25-15:2 (Vitale).  Officer McCurry

similarly testified that he could not remember whether a garbage can was present at the wrought-

iron enclosures at the relevant time.  See Tr. 232:13-15 (McCurry); Exh. 24.  Body-camera

footage taken near the wrought-iron enclosures just after Mr. Andrews's arrest shows what

appears to be a chair, a shopping cart and other detritus on the immediate eastern edge of the

wrought-iron enclosures.  See Exh. 2.4 at 1:20:31-1:20:33, 1:20:40-1:20:45, 1:20:48-1:20:55

(McCurry body-camera footage).[8]  As Officer Schumacher and Officer Vitale allege that Mr.

---

[8] This Court notes that body-camera footage taken from the sidewalk near the wrought-iron enclosures just after Mr. Andrews was stopped, frisked and arrested shows a man walking eastbound on Livonia Avenue pushing a large yellow mop bucket on wheels and approaching the wrought-iron enclosures from the direction of Livonia Avenue's intersection with Sheffield Avenue where the officers had been approximately one minute before Mr. Andrews was stopped. See Tr. 48:20-49:25, 65:15-24 (Vitale); Exh. 2.3 at 1:19:44-1:19:56 (Schumacher body-camera footage).  The man with the bucket appears in the video approximately forty (40) seconds after Officer Vitale began frisking Mr. Andrews.  Compare Exh. 2.2 at 1:19:05 (Vitale body-camera footage), with Exh. 2.3 at 1:19:44 (Schumacher body-camera footage).  Although the timeline suggests that the man with the rolling bucket could conceivably have been in the officers'

Andrews was standing against the roll-down gate on that side of the wrought-iron enclosures as they observed him from the corner of Livonia and Sheffield Avenues, these large items would have at least partially obstructed their sightline to Mr. Andrews. See Sections I.b.iv-vii, infra; Exh. 2.4 at 1:20:31-1:20:33, 1:20:40-1:20:45, 1:20:48-1:20:55 (McCurry body camera footage); Exhs. J.3-J.5.

### vii.  Mr. Andrews's Clothing

At the relevant time, Mr. Andrews was wearing a black hooded sweatshirt with a pocket in the front, a scarf wrapped around his neck, an unzipped jacket and sweatpants. See Exhs. 3-5 (post-arrest photographs of Mr. Andrews); see also Tr. 17:23-24 (Vitale), 96:9-97:1, 109:5-6, 111:9-17, 200:12-23 (Schumacher); Exh. 2.2 at 1:18:58, 1:31:22 (Vitale body-camera footage). Officer Schumacher testified that the top and bottom of Mr. Andrews's clothes, which were not themselves submitted as evidence, were made of a "sweat-pant material." Tr. 96:9-12 (Schumacher). Officer Schumacher testified that the hooded sweatshirt was a thin material that stretched and was "form-fitting." Tr. 111:14-16 (Schumacher). Officer Vitale testified that Mr. Andrews's clothing was "tighter fitting" and "like elastic to the touch." Tr. 19:3-8 (Vitale). Photographs and Officer Vitale's body-camera footage at the time he was frisking Mr. Andrews depict the sweatshirt to be thick material of some heft; for example, the hood rides high in folds around and behind Mr. Andrews's neck and does not fall flat against his shoulders and back. See Exh. 2.2 at 1:19:10-1:19:26 (Vitale body-camera footage); Exhs. 4-5. There are also bulky knit letter patches across the chest area of the sweatshirt. See Exh. 2.2 at 1:19:10-19:26 (Vitale body-camera footage); Exh. 3. Photographs in evidence of Mr. Andrews's clothing show his hooded

---

sightline when they allegedly observed Mr. Andrews making hand motions, given that this Court cannot so conclude with any certainty, its analysis does not rest on this possibility.

sweatshirt and pants to be looser fitting.  See Exhs. 3-5.  In the area of the hooded sweatshirt's

front lower pocket, the fabric bunches and covers the top of Mr. Andrews's sweatpants.  See

Exh. 3.  The sweatpants' fabric sags and does not hug Mr. Andrews's legs.  See Exhs. 4-5.  The

looseness of the sweatpants' fabric is also shown in the manner in which its side pocket hangs

open and is not taut.  See Exh. 4.

### b.  Events

#### i.  Officer Schumacher First Noticed Mr. Andrews On The Northeast Corner Of Livonia And Pennsylvania Avenues Just After 1:00 a.m.

Officer Schumacher testified that he first saw Mr. Andrews from behind just after 1:00

a.m. as the three officers were driving westbound in the right lane of Livonia Avenue towards the

intersection with Pennsylvania Avenue.  See Tr. 98:21-25, 100:3-13, 149:24-150:3 (Schumacher);

Exh. 21; Figure 1, Point A.  At the time, Mr. Andrews and a second individual were paused on the

intersection's northeast corner a few feet from the crosswalk.  See Tr. 100:11-23 (Schumacher).

Officer Schumacher did not see anyone else on the corner or in the vicinity and had not seen

anyone else for about a block.  See Tr. 100:24-101:18 (Schumacher).

Officer Schumacher testified that he then saw Mr. Andrews and the second individual

begin to cross Pennsylvania Avenue from the intersection's northeast corner, see Figure 1, Point

A, towards its northwest corner, see id. at Point B.  Mr. Andrews was crossing in the crosswalk

with a normal gait.  See Tr. 101:19-102:14 (Schumacher).  Officer Vitale and Officer McCurry

testified that they were not aware of Mr. Andrews at this time.  See Tr. 7:19-8:15, 46:10-12,

54:5-7 (Vitale), 228:19-21 (McCurry); Section I.b.iii, infra.

#### ii.  Officer Schumacher Looked At Mr. Andrews As Mr. Andrews Was In The Crosswalk And Allegedly Observed A Bulge In The Front Of Mr. Andrews's Waistband

Officer Schumacher testified that after noticing Mr. Andrews, he continued to drive

12

westbound into the intersection and reduced his patrol speed to "approximately coasting" in order to watch Mr. Andrews and the second individual in the crosswalk.  Tr. 104:11-105:3 (Schumacher).  According to Officer Schumacher, he did this because at the time, they were "the only two individuals in the area to even look at," and the officers on a midnight anti-crime tour "usually give everyone" an in-depth look.[9]  Tr. 102:15-23, 103:19-20 (Schumacher).[10]  Officer Schumacher testified with in-court demonstration that, when he and the car came abreast with Mr. Andrews in the middle of the intersection, he leaned over the vehicle's center console and looked at Mr. Andrews from a direct right angle across Officer Vitale.  See Tr. 105:4-12, 150:24-151:3 (Schumacher).

Officer Schumacher testified that as he leaned over the console and looked at Mr. Andrews at a direct right angle in this manner, Officer Schumacher and Mr. Andrews made direct eye contact.  See Tr. 108:2-9, 143:14-25 (Schumacher).  Then, with the vehicle in motion and while passing Mr. Andrews, Officer Schumacher looked down at the front of Mr. Andrews's waistband through the passenger-side window and noticed a bulge.  See Tr. 108:16-22, 150:11-151:3 (Schumacher).  Officer Schumacher testified that after he first saw the bulge as his vehicle coasted past Mr. Andrews, Officer Schumacher "followed [the bulge] to [his] back right, through the back passenger window, all the way until [Officer Schumacher's view of Mr. Andrews]

---

[9] As the record lacks any further relevant detail about the second individual, who Officer Schumacher testified was on the far side of Mr. Andrews as Officer Schumacher looked in their direction, this Court's analysis will not make any further reference to this person.  See Tr. 105:22-106:1 (Schumacher).

[10] Although Officer Schumacher began to testify that he seen Mr. Andrews before, this is not part of the motion record because in this Court's management of pre-hearing discovery, the Government declined to produce related information and reiterated during the hearing that it was not relying on evidence or argument that Officer Schumacher believed he recognized Mr. Andrews.  See Tr. 107:7-12 (Schumacher).

reached the back pillar of the car." Tr. 110:4-8 (Schumacher).  At this point Officer Schumacher lost sight of Mr. Andrews because the vehicle was moving faster than Mr. Andrews, such that Mr. Andrews became obscured by the back post of the vehicle.  Tr. 112:8-19, 151:4-18 (Schumacher).  On cross-examination, Officer Schumacher testified that he could not recollect whether Officer Vitale's body in the car's passenger seat or the vehicle's middle pillar obstructed his view of Mr. Andrews as the vehicle passed Mr. Andrews and Officer Schumacher lost his sightline.  See Tr. 151:19-153:18 (Schumacher).[11]

Officer Schumacher testified that he believed that the bulge he allegedly observed was a firearm because, in his experience, "most firearms are found in this waistband area, typically in the front." Tr. 109:1-3 (Schumacher).  Officer Schumacher testified that there were no pockets where he saw the bulge "to give [him] the impression that it might be an everyday item, cell phone or keys." Tr. 109:2-6 (Schumacher).  He testified that "[t]here was nothing in the hoodie sweatshirt pocket hanging low or anything like that." Tr. 109:2-6 (Schumacher).  On cross-examination, when Officer Schumacher was asked about his testimony that there were no pockets where he saw the bulge, he stated that his "testimony was that there [were] no pockets in [Mr. Andrews's] pants where his waistband was, . . . the front of his waistband." See Tr. 171:1-11 (Schumacher).  On re-direct, Officer Schumacher further testified that as he first passed Mr. Andrews and observed the bulge, he saw a pocket on the front of Mr. Andrews's sweatshirt.  See Tr. 200:12-21 (Schumacher).  According to Officer Schumacher, when he observed the bulge in the front of Mr. Andrews's waistband, he saw that the pocket on the front of Mr. Andrews's sweatshirt was flat because "[y]ou can tell there [were] no objects hanging that would look like,

---

[11] When Officer Schumacher was asked on cross-examination how tall Officer Vitale was, Officer Schumacher testified that he did not know Officer Vitale's height.  See Tr. 151:21-23 (Schumacher).

you know, an everyday item." Tr. 200:17-23 (Schumacher).

Officer Schumacher also testified and physically demonstrated that the bulge he saw at the front of Mr. Andrews's waistline was half above and half below the belt line.  See Tr. 109:9-25 (Schumacher).  He explained that he was able to make this observation through Mr. Andrews's sweatshirt because its material was "sweat kind of material, thin material, it stretches, it's form-fitting" and, as Mr. Andrews walked across the street, Officer Schumacher could see "pronounced points of the bulge at any given time" as Mr. Andrews's body shifted, and as his clothing shifted "left and right" and "up and down" on Mr. Andrews's body.  Tr. 111:14-20 (Schumacher).

In terms of the shape of the bulge that Officer Schumacher allegedly saw while driving past Mr. Andrews, Officer Schumacher testified that "it had a straight line on top of it with two distinct ends on either side of it."  Tr. 110:18-22, 113:2-4 (Schumacher).  Officer Schumacher further testified that he could not otherwise recall whether the bulge was L-shaped or any other shape.  Tr. 110:23-25 (Schumacher).

### iii. Officer Vitale And Officer McCurry First Became Aware Of Mr. Andrews After Officer Schumacher Allegedly Told Them That He Saw The Bulge But Officer Vitale And Officer McCurry Did Not Personally See A Bulge

Officer Vitale and Officer McCurry testified that they first became aware of Mr. Andrews when Officer Schumacher told them he had seen a bulge on him.  See Tr. 8:11-15, 8:21-9.6, 46:5-25, 47:22-48:1, 54:5-7 (Vitale), 228:19-21 (McCurry).  On cross-examination, Officer Schumacher testified that he could not recall describing the bulge to Officer Vitale and Officer McCurry in any way, stating where he had seen it on Mr. Andrews's body or stating that he believed it to be a gun.  See Tr. 154:7-15, 155:14-156:7 (Schumacher).  According to Officer Vitale, the vehicle was "a little bit past [Mr. Andrews] already" when Officer Schumacher asked

if they had seen "that guy" and stated that he had seen "a bulge in [his] waistband." Tr. 8:11-5, 9:2-6 (Vitale).  Officer Vitale testified that he immediately looked for a bulge in Mr. Andrews's waistband, but could not personally see one.  See Tr. 8:21-9:6, 47:2-6, 47:22-48:1 (Vitale). Although Officer McCurry testified that he could not remember when Officer Schumacher told him about the bulge, he testified that he also looked, but he could not remember whether he personally saw any bulge (Officer Vitale testified that it was his recollection that only Officer Schumacher said anything about the bulge).  See Tr. 47:22-48:1 (Vitale), 229:2-5, 241:16-19, 248:11-14, 253:8-10 (McCurry).

On cross-examination, Officer Vitale testified that when Officer Schumacher told him he had seen the bulge he had "just told [him] that it was a bulge."  Tr. 48:2-5 (Vitale).  Officer Vitale also testified that, on the date of the incident, he wrote in a report that Mr. Andrews was observed with an "L-shaped bulge in his waistband" because he "just interpreted" Officer Schumacher's observation that way.  Tr. 49:3-51:17 (Vitale).  When Officer Vitale was asked again whether he "wrote L-shaped bulge in the report based on [his] interpretation of what Officer Schumacher said, [and] not what he actually said," Officer Vitale responded: "Yeah." Tr. 51:4-7 (Vitale).

### iv.  Officer Schumacher Stopped The Car At The Corner Of Livonia And Sheffield Avenues So That The Officers Could Observe Mr. Andrews Further

Officer Schumacher testified that he did not approach Mr. Andrews immediately upon seeing the bulge because Officer Schumacher "wanted to continue to observe [Mr. Andrews] and gather more information."  Tr. 113:5-12 (Schumacher).  Officer Vitale testified that because the officers had already passed Mr. Andrews when Officer Schumacher said he had seen the bulge, Officer Vitale asked Officer Schumacher to pull over at the next intersection so Officer Vitale

16

"could look back down the block to see."  Tr. 8:21-9:6 (Vitale).

Officer Schumacher continued to drive westbound on Livonia Avenue for one block until its intersection with Sheffield Avenue, where he turned right and stopped the vehicle.  See Tr. 47:7-9 (Vitale); 113:14-19 (Schumacher); Figure 1, Point D; Section I.a.vi, supra.  Officer Schumacher testified that he did this so that the officers could look out the vehicle's passenger-side windows eastbound towards Mr. Andrews as Mr. Andrews walked westbound on Livonia Avenue.  See Tr. 47:7-9 (Vitale), 113:14-23 (Schumacher).

Officer Schumacher testified that from this vantage point, he could no longer see the bulge.  See Tr. 156:22-157:2 (Schumacher).  Officer Vitale also testified that he did not personally see a bulge in Mr. Andrews's waistband from this perspective, and that he never saw one prior to stopping and frisking Mr. Andrews.  See Tr. 47:7-16 (Vitale); Exhs. 10, 15, J.3-J.5.  Other than Officer McCurry's general testimony that he could not remember if he did or did not personally see a bulge after Officer Schumacher's statement that he had, Officer McCurry did not offer testimony as to whether he attempted to observe the bulge from his location at the corner of Livonia and Sheffield Avenues.  See Tr. 229:2-5, 241:16-19, 253:8-10 (McCurry); Section I.b.iii, supra.

> **v.  The Officers Allegedly Observed That Mr. Andrews Looked Around Nervously, Stopped And Stood With His Back Against A Roll-Down Gate On The Far Side Of The Wrought-Iron Enclosures**

Officer Schumacher testified that from his car, which was stopped at the corner of Livonia and Sheffield Avenues, see Figure 1, Point D, he observed Mr. Andrews walking westbound on Livonia Avenue in the officers' direction.  See Tr. 114:7-115:6 (Schumacher).  Officer Schumacher testified that Mr. Andrews then allegedly slowed his gait, looked around as if he did not know where to go, stopped and looked around again.  See Tr. 114:7-115:4

17

(Schumacher).  Officer Vitale and Officer McCurry also testified that they observed that Mr.

Andrews had slowed down.  See Tr. 9:7-15:7 (Vitale), 229:6-11 (McCurry).  Officer McCurry

testified that he observed that Mr. Andrews "began to look left and right over his shoulder" as if

"looking for a way out of the situation."  Tr. 229:6-11 (McCurry).  Officer Vitale and Officer

McCurry testified that they then observed that Mr. Andrews stopped walking.  See Tr. 9:7-10

(Vitale), 230:17-23 (McCurry).

All three officers testified that Mr. Andrews then walked to and stood with his back

against a storefront's roll-down gate to the east of the wrought-iron enclosures.  See Tr. 10:16-

15:2 (Vitale), 115:2-6 (Schumacher), 230:17-23 (McCurry); Exhs. 9, 10, 24; Figure 1, Point C.

In other words, when Mr. Andrews stopped against the roll-down gate he was on the far side of

the wrought-iron enclosures vis-à-vis the officers' position in the stopped car on the corner of

Livonia and Sheffield Avenues, and the officers were observing Mr. Andrews through the

wrought-iron enclosures.  See Tr. 14:14-23 (Vitale), 115:7-117:10, 118:9-119:8 (Schumacher);

231:10-15 (McCurry); Exhs. 9, 15, 24; Figure 1, Point C; see also Exh. 10.  Officer Vitale

testified using Exhibit 9 that Mr. Andrews was "standing pretty much up against the roll-down

gate to the right of [the] wrought-iron fence."  Tr. 14:14-19 (Vitale); Exh. 9.  Officer

Schumacher testified using Exhibit 15 that Mr. Andrews wound up on the "further side, which

would be the east side" of the wrought-iron enclosures.  Tr. 116:10-14 (Schumacher).[12]

---

[12] As noted in Section I.a.v., supra, the photographs in Exhibits 9 and 15 permit an understanding of
Point C's general layout.  The officers' general sightline of Point C from the stopped car at Point D
is more accurately shown in Exhibits J.3-J.5.  See Section I.a.vi, supra; Section I.b.vi, infra.

18

### vi. The Officers' View Of Mr. Andrews Was Allegedly Unobstructed By Transient Objects At The Time They Made Their Observations Of Mr. Andrews As He Stood Against The Roll-Down Gate On The Far Side Of The Wrought-Iron Enclosures

Officer Schumacher testified that at the time Mr. Andrews stood on the far side of the wrought-iron enclosures from where the officers' car was stopped, Officer Schumacher thought that he had a "pretty good view." Tr. 116:15-117:6, 119:9-12 (Schumacher); Exhs. 15, J.3-J.5. As noted above, all three officers testified that they could not remember any transient items by the wrought-iron enclosures that would have obstructed their sightline of Mr. Andrews from the stopped car as Mr. Andrews stood on the wrought-iron enclosures' far side or, if there were, their position. See Tr. 14:2-15:2 (Vitale), 116:15-117:6, 119:9-12, 139:23-140:24, 146:10-147:5, 164:4-24, 192:8-19 (Schumacher), 232:13-15 (McCurry); Section I.a.vi, supra. As also noted above, body-camera footage shows what appears to be a chair, a shopping cart and other detritus on the immediate eastern edge of the wrought-iron enclosure where Mr. Andrews allegedly stood with his back against the roll-down gate. See Exh. 2.4 at 1:20:31-1:20:33, 1:20:40-1:20:45, 1:20:48-1:20:55 (McCurry body-camera footage); Section I.a.vi, supra.

### vii. The Officers Allegedly Observed Mr. Andrews Making Suspicious Hand Or Arm Movements As Mr. Andrews Stood Against The Roll-Down Gate On The Far Side Of The Wrought-Iron Enclosures

Officer Schumacher testified that through the passenger window of the stopped car on the corner of Livonia and Sheffield Avenue he observed Mr. Andrews, who was on the far side of the wrought-iron enclosures, reach downward then upward with his right hand towards the center of his body near where Officer Schumacher had first observed the bulge in Mr. Andrews's waistband. See Tr. 113:14-19, 117:16-118:8, 159:11-20 (Schumacher); Section I.a.vi, supra. According to Officer Schumacher, who reenacted the motion he allegedly saw, Mr. Andrews's "shoulder dipped" when he reached up and down in this manner. See Tr. 117:16-118:5, 119:15-

18 (Schumacher).  Officer Schumacher testified that he could not see whether Mr. Andrews's hand was outside or inside his clothing when Mr. Andrews made the motion.  See Tr. 118:6-8, 171:21-23 (Schumacher).  Officer Schumacher also testified that he believed that Mr. Andrews "had retrieved a firearm from his waistband."  See Tr. 119:19-23 (Schumacher).  On cross-examination, Officer Schumacher testified that he could not see whether Mr. Andrews grabbed anything when making the motion, including the bulge that Officer Schumacher observed at the front of Mr. Andrews's waistband, but that it would have been a dangerous situation if Mr. Andrews had retrieved a gun.  See Tr. 171:12-172:2, 210:22-211:4, 211:14-212:9 (Schumacher).

Officer Vitale testified that when he looked down the block from inside the car on the corner of Livonia and Sheffield Avenues, he observed Mr. Andrews, who was standing against the roll-down gate on the far side of the wrought-iron enclosures, put his entire forearm up to his elbow under his waistband and inside his pants, and that Officer Vitale believed that Mr. Andrews "was hiding a firearm in his pants" at the time.  See Tr. 9:7-10:13, 15:24-16:4, 54:22-55:2, 56:9-17, 60:21-25, 62:21-24, 80:9-15; 84:1-3 (Vitale); Exhs. J.3-J.5; Section I.a.vi, supra. When Officer Vitale acted out Mr. Andrews's motion in this regard for the Court, half of his arm up to his elbow disappeared inside his pants then was withdrawn.  See Tr. 9:15-10:7 (Vitale).  On cross-examination, Officer Vitale testified that on the date of the incident he wrote in a report that Mr. Andrews was observed "adjusting his waistband."  Tr. 60:21-25, 63:25-64:10 (Vitale). Officer Vitale also testified on cross-examination that in an interview occurring about two weeks after the incident, he described Mr. Andrews's hand motion like that of tucking in a shirt.  See Tr. 63:22-24 (Vitale).

Officer McCurry testified that he saw Mr. Andrews place his right hand approximately wrist deep inside his waistband and underneath his clothing.  See Tr. 229:16-230:9 (McCurry).

Officer McCurry testified that because Officer Schumacher had told him about a bulge, Officer McCurry believed Mr. Andrews's motion to be an attempt "to conceal a firearm."  See Tr. 230:12-16 (McCurry).  On cross-examination, Officer McCurry testified that he could not remember where he was when he made this observation or when he made it, including whether it happened while he was in the vehicle.  See Tr. 244:15-23, 248:8-10, 253:11-13 (McCurry).  For example, when Officer McCurry was asked whether he had observed Mr. Andrews making the waistband motion before Officer McCurry got out of the vehicle, Officer McCurry testified that he did not "remember when [he] made the observations."  Tr. 244:15-23 (McCurry).

### viii.   The Officers Did Not Tell Each Other About The Hand Motions They Each Allegedly Observed Mr. Andrews Make

Officer Schumacher testified that he could not recall telling Officer Vitale or Officer McCurry about the hand motion he saw Mr. Andrews make when he made his observation or at any point, in part because he was "not sure if [he] really knew exactly what [he] was seeing," and that, even at the time of his testimony, he was "not sure."  Tr. 122:13-123:1 (Schumacher).  Officer Schumacher testified that he may have "assumed that [the other officers] were looking at the same thing" that he was.  Tr. 138:16-22 (Schumacher).  On cross-examination, Officer Schumacher further testified that he could not recollect telling Officer Vitale or Officer McCurry prior to their exiting the vehicle that Officer Schumacher thought that Mr. Andrews had just taken a gun out of his pants or to be careful because Mr. Andrews might have a gun in his hand.  See Tr. 142:2-143:7, 174:7-16 (Schumacher).

Officer Vitale also testified on cross-examination that he could not remember saying anything to Officer Schumacher or Officer McCurry about the hand motion he allegedly saw Mr. Andrews make.  See Tr. 64:15-17 (Vitale).  Officer McCurry, who could not recollect where he was or when he allegedly observed Mr. Andrews make a hand motion, did not offer testimony

21

about whether he told Officer Schumacher or Officer Vitale about his observations.  See Tr.

244:15-23, 248:8-9, 253:11-13 (McCurry).

> ### ix.  The Officers Went To Stop And Frisk Mr. Andrews As Mr. Andrews Allegedly Walked Towards Cars Parked On Livonia Avenue And Then Back Towards The Corner Of Livonia And Pennsylvania Avenues

Officer Schumacher testified that, after he observed Mr. Andrews's hand motion from the

corner of Livonia and Sheffield Avenues, Officer Schumacher backed up the vehicle and turned

it to drive back eastbound on Livonia Avenue towards Mr. Andrews.  See Tr. 119:24-120:3

(Schumacher); see also Tr. 16:5-12 (Vitale).  According to Officer Schumacher, this was because

Mr. Andrews was at that point a person suspected of criminal activity and was going to be

stopped and frisked.  See Tr. 181:18-182:5 (Schumacher).

As Officer Schumacher returned towards Mr. Andrews, Officer Schumacher testified that

he observed Mr. Andrews walk away from the building line with the wrought-iron enclosures

towards the Livonia Avenue curb where a row of parked cars was.  See Tr. 120:4-10

(Schumacher).  Officer Schumacher believed that Mr. Andrews did this in order to drop a gun

between two parked cars where the officers would not be able to see.  See Tr. 120:11-121:6

(Schumacher).  Officer Schumacher testified that Mr. Andrews never actually reached the parked

cars and that he did not see Mr. Andrews drop or throw anything anywhere.  See Tr. 193:9-15,

206:16-10, 211:5-7, 211:5-7, 211:18-22, 212:11-13, 211:17-22 213:19-21 (Schumacher).

Officer McCurry also testified that at some point Mr. Andrews walked towards the

parked cars.  See 232:17-22 (McCurry).  On cross-examination, Officer McCurry testified that he

could not remember from where he made the observation.  See Tr. 253:14-18 (McCurry).

Officer Schumacher and Officer Vitale testified that they observed that Mr. Andrews then

began to walk eastbound on Livonia Avenue back towards the corner of Livonia and

Pennsylvania Avenues.  See Tr. 17:9-18, 83:19-25 (Vitale), 123:4-14 (Schumacher).  Officer

Schumacher testified that the officers were already driving eastbound towards Mr. Andrews at

the time he made this observation.  See Tr. 123:4-14 (Schumacher).  Officer Vitale testified that

he made this observation after seeing Mr. Andrews making the hand motion, but his testimony

did not make clear where Officer Vitale was at the time.  See Tr. 17:9-18 (Vitale).

### x.  The Officers' Claimed Reasons For Stopping Mr. Andrews

Given that the officers did not tell each other about the hand motions they allegedly

observed Mr. Andrews making, it is necessary to give particular attention to their testimony

about the alleged justification for stopping Mr. Andrews.  See Section I.b.viii, supra.

Officer Schumacher testified that Mr. Andrews was stopped and frisked because (a) the

bulge he observed was "the same size and shape of a firearm," (b) Mr. Andrews slowed, looked

around and stopped by the roll-down gate, (c) Mr. Andrews made the hand gesture, (d) Mr.

Andrews walked towards the car line, and (e) Mr. Andrews walked back towards Livonia

Avenue's corner with Pennsylvania Avenue.  See Tr. 138:23-139:6 (Schumacher).

Officer Vitale testified that he frisked Mr. Andrews based on (a) Officer Schumacher's

bulge observation, (b) Officer Vitale's observation of Mr. Andrews's hand motion, and (c)

Officer Vitale seeing Mr. Andrews stop, appear nervous, walk by the wrought-iron fence and

walk back towards Livonia Avenue's intersection with Pennsylvania Avenue.  See Tr. 74:7-10,

83:20-84:2 (Vitale).[13]

---

[13] Although Officer Vitale also testified that Mr. Andrews made statements after the frisk began
that made him question whether Mr. Andrews was waiting for a cab, this is irrelevant to whether
reasonable suspicion existed at the inception of the stop and frisk, which is the moment of
measure for its legality.  See Tr. 31-32, 85:2-11 (Vitale); Exh. 2.2 at 1:19:06 (Vitale body-
camera footage); United States v. Weaver, 9 F.4th 129, 140 (2d Cir. 2021) (finding that because
an officer's action must be justified at its inception, "when reviewing the constitutionality of a
frisk for weapons, the [c]ourt must examine the facts that preceded the frisk") (citations

Officer McCurry testified that Mr. Andrews was stopped due to Officer Schumacher stating "that he saw a bulge, then [Mr. Andrews's] slowing of [his] pace and him looking side to side then finally the hand-tucking motion, that made me believe that [Mr. Andrews] was in possession of a firearm." Tr. 249:21-250:4 (McCurry).

### xi. Officer McCurry Was The First Officer To Exit The Car Westbound Of Mr. Andrews In Case Mr. Andrews Attempted To Flee In That Direction

As Officer Schumacher drove eastbound on Livonia Avenue towards Mr. Andrews, but before reaching Mr. Andrews, he stopped, and Officer McCurry exited the vehicle. See Tr. 16:13-17:2 (Vitale), 121:7-12, 123:4-9 (Schumacher), 233:13-18 (McCurry). Although there is no testimony to establish clearly how far westbound Officer McCurry exited the vehicle on Livonia Avenue, when Officer Vitale's body-camera footage begins to record, the car is on Livonia Avenue and slows to a stop on the west side of the wrought-iron enclosures. See Exh. 2.2 at 1:18:26 (Vitale body-camera footage). This may be the location where Officer McCurry exited the vehicle given Officer Schumacher's testimony that Officer McCurry was the first to exit the vehicle as the officers drove eastbound towards Mr. Andrews, and the body-camera footage shows Officer Vitale exiting the vehicle approximately twenty seconds later after Officer Schumacher drives slightly farther east, nearer to the wrought-iron enclosures. Compare Exh. 2.2 at 1:18:26 (Vitale body-camera footage), with id. at 1:18:48.

According to Officer Schumacher, Officer McCurry exited the vehicle first in this

---

omitted)); United States v. Rivera, 543 F. Supp. 2d 335, 338 n.1 (S.D.N.Y. 2008) (noting the officer's testimony that he believed the defendant was pretending to be deaf during the frisk, and finding that "this fact cannot be used to justify the frisk because the frisk ha[d] already begun"). Officer Vitale testified that Mr. Andrews told him that he was going home to a neighborhood that was further from the address where Mr. Andrews then gave Officer Vitale as the one where he lived. See Tr. 31:2-32:18 (Vitale); Exh. 2.2 at 1:19:15-1:19:25 (Vitale body-camera footage).

manner so that Officer McCurry could look about to see if Mr. Andrews had dropped a firearm

and also so that Officer McCurry could stop Mr. Andrews if Mr. Andrews tried to escape the

other officers by fleeing westbound.  See Tr. 16:13-17:2 (Vitale), 122:6-12 (Schumacher).

Officer Vitale and Officer McCurry testified that Officer McCurry got out first in case Mr.

Andrews tried to double back and run that way, but their testimony did not mention that Officer

McCurry was also meant to look for a possibly discarded firearm.  See Tr. 16:13-17:4 (Vitale),

233:18-22, 240:25-241:6 (McCurry).  On cross-examination, Officer McCurry testified that he

could not remember the conversation with his colleagues to develop the strategy to block Mr.

Andrews from fleeing, but that this "is a practice we do very often," i.e., letting "someone out [of

the vehicle] earlier" in case a suspect runs from another officer.  See Tr. 248:22-249:3

(McCurry).  When Officer Vitale was asked what Officer Schumacher said about Mr. Andrews

being stopped, Officer Vitale testified that he could not remember what Officer Schumacher

said, including whether Officer Schumacher told Officer McCurry that his role was to block Mr.

Andrews from potentially fleeing.  See Tr. 65:6-14 (Vitale).

> **xii.   Officer Vitale Was The Second Officer To Exit The Car So That He
> Could Stop Mr. Andrews, And Officer Schumacher Intended To
> Continue Driving Eastbound In Case Mr. Andrews Attempted To
> Flee In That Direction**

Officer Schumacher then drove the vehicle east and stopped slightly west of Mr.

Andrews.  See Exh. 2.2 at 1:18:48-1:18:52 (Vitale body-camera footage).  Officer Vitale then

exited the vehicle to stop Mr. Andrews.  See Tr. 17:5-8 (Vitale), 123:9-10 (Schumacher).

According to Officer Schumacher, by the time Officer Vitale exited the car, Mr. Andrews had

walked about 10 to 15 feet eastbound from the place where he had stopped by the roll-down gate.

See Tr. 143:8-13 (Schumacher).  Officer Vitale's body-camera footage shows Mr. Andrews in

the middle of the sidewalk about halfway between the building line and the street, facing south

towards the street.  See Exh. 2.2 at 1:18:55 (Vitale body-camera footage).  Officer Schumacher testified that, at the time Officer Vitale exited the vehicle, Officer Schumacher did not know with any certainty where Mr. Andrews's suspected firearm was.  See Tr. 211:8-213:23 (Schumacher).  According to Officer Vitale, the period of observation prior to the stop had been approximately one minute.  See Tr. 48:20-49:25, 65:15-24 (Vitale).

On exiting the vehicle to stop Mr. Andrews, Officer Vitale activated his body camera.  See Tr. 71:10-72:18 (Vitale); Exh. 2.2 at 1:18:54 (Vitale body-camera footage).[14]  When Officer Vitale was cross-examined about why he had not activated his body camera sooner, Officer Vitale testified that the period prior to the stop were "just [the officers'] observations."  Tr. 72:7-18 (Vitale).  On re-direct, Officer Vitale testified that, had he activated his body camera sooner, it would have depicted "the dashboard" of the car.  Tr. 82:16-18 (Vitale).

After Officer Vitale exited the car, Officer Schumacher briefly drove eastbound in case Mr. Andrews fled Officer Vitale in that direction, requiring interception.  See Tr. 123:9-14 (Schumacher).

### xiii.  Officer Vitale Stopped Mr. Andrews; Mr. Andrews Did Not Flee; Officer Schumacher Parked Just Eastbound Of Them, Exited The Vehicle, Walked Past Officer Vitale And Mr. Andrews And Walked Westbound Toward Officer McCurry

When Officer Vitale approached Mr. Andrews and identified himself as police, Mr. Andrews did not flee.  See Tr. 17:3-4 (Vitale), 123:15-22 (Schumacher), 234:3-4 (McCurry); Exh. 2.2 at 1:18:54 (Vitale body-camera footage).  Once Officer Schumacher saw that Officer Vitale made contact with Mr. Andrews and that Mr. Andrews did not run, Officer Schumacher

---

[14] For clarity, Officer Vitale activated his body camera thirty seconds after the time clock begins in the preserved footage.  In other words, because Officer Vitale's body camera footage begins at Exh. 2.2 at 1:18:24, the moment of activation was when the audio in the footage commenced, which was at 1:18:54.  See Exh. 2.2 at :18:54 (Vitale body-camera footage); Section I.a.i, supra.

put the car in park and got out.  See Tr. 123:15-22 (Schumacher); Exh. 2.2 at 1:18:54 (Vitale

body-camera footage).  Body-camera footage shows the officers' vehicle parked almost directly

in front of where Officer Vitale stopped Mr. Andrews.  See Exh. 2.3 at 1:20:35 (Schumacher

body-camera footage); Exh. 2.4 at 1:20:36 (McCurry body-camera footage).  Officer

Schumacher then walked past where Officer Vitale had stopped Mr. Andrews and westbound

toward Officer McCurry.  See Tr. 123:23-124:1, 175:5-8 (Schumacher).  Officer Schumacher

testified that he did this to learn from Officer McCurry whether he had found a discarded

firearm.  See Tr. 124:1-5, 175:5-8, 207:14-17, 210:3-11 (Schumacher).

### xiv.   Officer Vitale Began Frisking Mr. Andrews's Chest And Torso

Officer Vitale's body-camera footage shows that, meanwhile, when Officer Vitale first

stopped Mr. Andrews, Mr. Andrews was standing with a cellular telephone in his hand facing the

street between the wrought-iron fence and the northwest corner of Livonia Avenue's intersection

with Pennsylvania Avenue.  See Exh. 2.2 at 1:19:00 (Vitale body-camera footage).  Mr. Andrews

said that he was waiting for a cab and gestured to his cellular telephone, then looked to and

gestured at the corner of Livonia and Pennsylvania Avenues.  See Exh. 2.2 at 1:18:55-1:19:01

(Vitale body-camera footage).  His telephone was on speaker and playing a sound that may have

been hold music or a ring tone although the record does not establish was the sound actually was.

See Exh. 2.2 at 1:18:55-1:19:01 (Vitale body-camera footage).  Officer Vitale asked Mr.

Andrews why he was "ducking in the corner over there before."  Tr. 29:15-16 (Vitale); Exh. 2.2

at 1:19:00 (Vitale body-camera footage).  Officer Vitale testified that the corner he meant was

the area by the roll-down gate and the wrought-iron enclosures.  See Tr. 29:15-19 (Vitale).

Officer Vitale testified that he did not explicitly ask Mr. Andrews about the hand motion because

he "didn't want to allude to [Mr. Andrews] that [he] had seen what [Mr. Andrews] was doing"

because, "[a]t this time, [he] was approaching him alone." Tr. 29:23-30:7 (Vitale).  In response,

Mr. Andrews gestured at the corner of the intersection and repeated that he was waiting for a

cab.  See Exh. 2.2 at 1:19:02 (Vitale body-camera footage).  Officer Vitale, who was in front of

and facing Mr. Andrews, began to frisk Mr. Andrews's chest.  See Exh. 2.2 at 1:19:04-1:19:13

(Vitale body-camera footage).  As Officer Vitale felt Mr. Andrews's chest, he asked him what

the bulge there was, and Mr. Andrews responded that it was his scarf.  See Exh. 2.2 at 1:19:05-

1:19:08 (Vitale body-camera footage).

       Officer Vitale testified that he began frisking Mr. Andrews's chest because Mr. Andrews

had a bulge there which was created by his scarf.  See Tr. 19:12-24 (Vitale).  Officer Vitale also

testified that he began by frisking Mr. Andrews's chest because he was alone with Mr. Andrews

and he was concerned that Mr. Andrews would grab the gun that Officer Vitale suspected Mr.

Andrews had in his waistband or pants.  See Tr. 19:12-24, 74:11-19 (Vitale).

       Officer Vitale then proceeded to frisk Mr. Andrews's torso and ask him questions about

where he was headed.  See Exh. 2.2 at 1:19:13-1:19:26 (Vitale body-camera footage).  Body-

camera footage of this part of the frisk lacks much visual detail because Officer Vitale was

standing in front of and close to Mr. Andrews's body at the time such that the camera lens was

often obstructed, but Officer Vitale's right hand can be seen in certain moments frisking Mr.

Andrews's left armpit and then lower on his torso.  See Tr. 19:9-11 (Vitale); Exh. 2.2 at 1:19:13-

1:19:26 (Vitale body-camera footage).

### xv.  Officer Vitale Continued To Frisk Mr. Andrews Before Officer Schumacher And Officer McCurry Joined Him, And Discovered A Firearm Between Mr. Andrews's Legs

       Officer Schumacher and Officer McCurry were to Officer Vitale's west and had not yet

joined him as Officer Vitale continued frisking Mr. Andrews.  Tr. 19:12-34:4 (Vitale), 123:25-

28

124:5, 175:5-14, 207:14-17, 210:3-11 (Schumacher); Section I.b.xiii, supra; Section I.b.xvi, infra. Officer Vitale then told Mr. Andrews to spread his legs and Officer Vitale bent over and discovered a firearm between Mr. Andrews's legs about five seconds later where it was "tucked up" and "inside his pants." Tr. 19:12-24:4 (Vitale); see Section I.b.xvi, infra (Officer McCurry retrieving the gun from Mr. Andrews's groin and buttocks area where it was against Mr. Andrews's skin and under Mr. Andrews's pants and undergarments); Exh. 1; Exh. 2.2 at 1:19:28 (Vitale body-camera footage); Exhs. J.1-J.2. As described and reenacted by Officer Vitale, the firearm was positioned with its handle pointing up towards the rear of Mr. Andrews's body and its barrel pointing forward towards the front of Mr. Andrews's body. See Tr. 20:4-6, 22:1-6 (Vitale).

The moment that Officer Vitale discovered the gun on Mr. Andrews is captured on Officer Vitale's body-camera footage at the moment when Officer Vitale says "Will"—Officer Schumacher's first name—to alert Officer Schumacher to the fact that he had discovered a gun. See Tr. 23:10-24:4, 33:8-17 (Vitale), 175:5-10 (Schumacher), 234:12-14 (McCurry); Exh. 2.2 at 1:19:26-1:19:32 (Vitale body-camera footage). Officer Schumacher, who was to Officer Vitale's west where he had walked towards Officer McCurry, responded by asking Officer Vitale if he had "Ricky," a code word that the officers used for a firearm so as not to alert a suspect that they had found a gun. See Tr. 23:17-24:1 (Vitale), 124:2-19, 175:5-10, 207:11-17, 210:3-11 (Schumacher), 234:15-25 (McCurry); Exh. 2.2 at 1:19:40 (Vitale body-camera footage); Section I.b.xiii, supra.

Officer Vitale stated that he had found "Ricky." See Tr. 124:20-24, 175:7-10 (Schumacher), 234:16-17 (McCurry). Although the audio is muffled and little can be seen on Officer Vitale's body-camera footage for about forty seconds after he said "Will" because

29

Officer Vitale had his body pressed up against Mr. Andrews, Officer Vitale testified that, among

other things, he told Mr. Andrews to "let it go," thinking that if Mr. Andrews unclenched his

buttocks, the firearm would fall to the ground, but Mr. Andrews responded that he could not.

See Tr. 34:8-35:7 (Vitale); Exh. 2.2 at 1:19:37-1:20:17 (Vitale body-camera footage); Section

I.b.xvi, infra.

### xvi. Officer Schumacher And Officer McCurry Handcuffed Mr. Andrews And Officer McCurry Retrieved A Gun From Inside Mr. Andrews's Pants And Undergarments

Officer Schumacher and Officer McCurry then joined Officer Vitale and Mr. Andrews.

See Exh. 2.3 at 1:19:33 (Schumacher body-camera footage). Officer Schumacher's body-camera

footage shows that when he turned to walk towards Officer Vitale to assist him, Officer

Schumacher was facing the roll-down gate near the wrought-iron enclosures. See Tr. 143:8-13

(Schumacher); Exh. 2.3 at 1:19:33-1:19:40 (Schumacher body-camera footage). When Officer

Schumacher turned towards Officer Vitale, Officer Vitale was standing in front of and facing Mr.

Andrews with his hands near Mr. Andrews's waistband area. See Tr. 22:17-18, 25:1-4 (Vitale),

124:25-125:4 (Schumacher); Exh. 2.3 at 1:19:33-1:19:40 (Schumacher body-camera footage).

Officer Schumacher and Officer McCurry walked to the rear of Mr. Andrews and

handcuffed him from the back within approximately thirty seconds. See Tr. 125:7-10, 130:15-24

(Schumacher), 235:1-4 (McCurry); Exh. 2.3 at 1:19:36-1:20:07 (Schumacher body-camera

footage). Once Mr. Andrews was handcuffed, Officer Schumacher activated his body camera.

See Tr. 125:15-22, 131:16-19 (Schumacher);[15] Exh. 2.3 at 1:20:03 (Schumacher body-camera

---

[15] For clarity, Officer Schumacher activated his body camera thirty seconds after the time clock begins in the preserved footage. In other words, because Officer Schumacher's body camera footage begins at Exh. 2.3 at 1:19:35 (Schumacher body-camera footage), the moment of activation was when the audio in the footage commenced, which was at 1:20:05. See Exh. 2.3 at 1:20:05 (Schumacher body-camera footage); Section I.a.i, supra.

footnote).  Officer Schumacher testified that he had not activated it sooner because he did not

have the chance because he was driving and making observations.  See Tr. 125:23-126:2,

201:21-202:2 (Schumacher).  Officer Schumacher further testified that if he had activated the

camera sooner, it would have recorded the car's steering wheel.  See Tr. 126:2 (Schumacher).

Officer McCurry activated his body camera approximately five seconds after Officer

Schumacher activated his body camera.  See Exh. 2.4 at 1:20:10 (McCurry body-camera

footnote).[16]  On cross-examination, Officer McCurry testified that he believed that it was not safe

for him to do so sooner.  See Tr. 253:19-23 (McCurry).

Officer McCurry was standing behind the now-handcuffed Mr. Andrews.  See Exh. 2.3 at

1:20:20 (Schumacher body-camera footnote).  Officer McCurry then pulled back both Mr.

Andrews's pants and undergarments and retrieved the firearm "from inside his butt cheeks and

also the groin area" where it was against Mr. Andrews's skin.  Tr. 235:7-15, 249:11-18

(McCurry); see Tr. 24:24-25:8 (Vitale), 125:13-14, 135:7-136:9 (Schumacher); Exh. 1; Exh. 2.3

at 1:20:29 (Schumacher body-camera footnote); Exh. 2.4 at 1:20:20-1:20:34 (McCurry body-

camera footnote).  Officer McCurry testified that he could not remember if Mr. Andrews's

undergarment was underwear or long johns, and Officer McCurry testified that it took him about

ten seconds to retrieve the firearm from inside Mr. Andrews's clothes.  See Tr. 235:13-15,

249:11-18 (McCurry).

The firearm was approximately 5 inches long at its longest and 3.75 inches high at its

highest.  See Tr. 257:11-258:11 (Miller); Exh. 1; Exhs. J.1-J.2.

---

[16] Again, although the time clock on Officer McCurry's body-camera footage begins at 1:19:40, it was at 1:20:10 when its audio begins so that is the point when Officer McCurry activated the device.  Compare Exh. 2.4 at 1:19:40 (McCurry body-camera footnote), with id. at 1:20:10.

### xvii.  Officer Schumacher Placed A Radio Transmission After Mr. Andrews's Arrest Reporting The Stop And Requesting Another Police Vehicle

Approximately ten seconds after Mr. Andrews was handcuffed, Officer Schumacher placed a radio transmission reporting Mr. Andrews's stop on the corner of Livonia and Pennsylvania Avenues and calling for another police vehicle at the location.  See Tr. 134:4-12 (Schumacher); Exh. 2.3 at 1:20:10 (Schumacher body-camera footage).  Other officers arrived on the scene just over one minute later.  See Exh. 2.2 at 1:21:39 (Vitale body-camera footage); Exh. 2.3 at 1:21:30 (Schumacher body-camera footage).

### xviii.  Mr. Andrews's Post-Arrest Statements

According to Mr. Andrews's original motion papers, after he was arrested in connection with the unlawful stop-and-frisk he made post-arrest statements to NYPD officers on the morning of the incident.  See ECF No. 14-1 ¶ 13.  Mr. Andrews's instant motion seeks to suppress the post-arrest statements as tainted by the unconstitutionality of the stop-and-frisk that led to his arrest, and his original motion included a video exhibit of the statements at issue.  See id., Exh. E.[17]  The Government successfully objected to the admission of that video footage during the suppression hearing such that it is not in the hearing record.  See Tr. 76:8-80:5 (Vitale).  The parties have not briefed issues pertaining to Mr. Andrews's post-arrest statements other than the Government's brief statement in an early opposition filing that after NYPD personnel read Mr. Andrews his Miranda rights, Mr. Andrews indicated his understanding of his rights, waived them, and proceeded to make the post-arrest statements that are recorded in the video footage referenced by Mr. Andrews's motion.  See ECF No. 16 at 6.

---

[17] The video exhibit was delivered to Chambers in native format but was not filed on ECF due to technical limitations.

### xix.   Evidence Of Officer Misconduct

On cross-examination, Mr. Andrews's counsel elicited testimony from Officer Schumacher about three instances in which the Civilian Complaint Review Board ("CCRB") substantiated that he had committed misconduct in the performance of his duties, and from Officer Vitale about one instance in which the NYPD Internal Affairs Bureau ("IAB") substantiated an allegation against him.

First, Officer Schumacher testified that although the CCRB's investigation of misconduct allegations against him arising from an incident occurring the year prior to the Mr. Andrews incident later resulted in substantiated findings against him for making a false statement and for failure to record an incident on his body camera as required, Officer Schumacher maintained that what actually happened was different than what the CCRB concluded.  See Tr. 183:18-8, 188:16-190:22 (Schumacher).

Second, Officer Schumacher testified that, in connection with a CCRB investigation of unlawful search and force allegations against him roughly eight years prior to the Mr. Andrews incident, the CCRB found that Officer Schumacher had made false statements to it about certain events and substantiated the misconduct allegations.  See Tr. 186:11-21 (Schumacher).  On re-direct, Officer Schumacher testified that although the CCRB reached a different conclusion about the force, he did not commit the unlawful force alleged, and the IAB later found the allegation unsubstantiated.  See Tr. 202:9-204:10 (Schumacher).

Third, Officer Schumacher testified that, in connection with a CCRB investigation into an allegation of misconduct against him occurring five years prior to the Mr. Andrews incident, he denied using profanity against a member of the public.  See Tr. 187:22-188:5 (Schumacher).  Then, when Officer Schumacher was shown a video of the incident in which he did use the

33

profanity, he admitted to doing it.  See Tr. 188:1-8 (Schumacher).  Officer Schumacher

explained that although he had initially denied the profanity to investigators because he had not

remembered making it, upon "seeing it in the video, it obviously happened."  Tr. 188:1-15

(Schumacher).

       Fourth, Officer Vitale testified that an IAB investigation of misconduct allegations

against him close in time to the Mr. Andrews incident ultimately resulted in a substantiated

finding against him for failing to activate his body camera as required, although he could not

recall receiving a related sanction.  See Tr. 67:20-23, 70:22-71:9 (Vitale).

## II.   Legal Standards

### a.   Reasonable Suspicion For Warrantless Stop And Frisk

       The Fourth Amendment protects "against unreasonable searches and seizures."  U.S.

Const. amend. IV.  "Warrantless searches and seizures are per se unreasonable under the Fourth

Amendment—subject only to a few specifically established and well-delineated exceptions[,]"

one of which is an investigative stop and frisk under Terry v. Ohio, 392 U.S. 1 (1968).  Weaver,

9 F.4th at 138.  The defendant bears the burden of proving he had a reasonable expectation of

privacy in the place where the evidence was found.  See United States v. Delva, 858 F.3d 135,

148 (2d Cir. 2017).  Here, the premise of Mr. Andrews's motion is that he has a reasonable

expectation of privacy in his own person and clothing, see ECF Nos. 14, 96, which the

Government does not dispute, see ECF Nos. 16, 94, 98.[18]  This being uncontested, the burden

---

[18] Mr. Andrews submitted a declaration with his opening motion papers stating that an officer
stopped and frisked him during the incident.  See ECF No. 14-1.  It should be noted that although
Mr. Andrews's declaration was filed unsigned due to logistical difficulties encountered by his
counsel in obtaining Mr. Andrews's signature while he was in custody during the COVID-19
pandemic, the Government agreed on the record to accept Mr. Andrews's declaration provided
that Mr. Andrews swore under oath to the truth of its contents, which Mr. Andrews then did
during the same appearance.  See Dkt. Entry 1/27/2021; Terry, 392 U.S. at 16-17 ("It must be

then shifts to the government to show an exception to the warrant requirement.  See United

States v. Chavous, No. 19 Crim. 559 (DLI), 2021 WL 2953124, at *3 (E.D.N.Y. July 14, 2021)

("Since the [g]overnment searched and seized [the d]efendant without a warrant, the

[g]overnment must demonstrate by a preponderance of the evidence that the search or seizure did

not violate the Fourth Amendment."); United States v. Fleming, No. 18 Crim. 197 (KAM), 2019

WL 486073, at *4 (E.D.N.Y. Feb. 6, 2019) (citing United States v. Perea, 986 F.2d 633, 639 (2d

Cir. 1993)).  "On a motion to suppress evidence in a criminal trial, once [the defendant]

establishes a basis for his motion, the burden rests on the [g]overnment to provide, by a

preponderance of the evidence, the legality of the actions of its officers."  United States v.

---

recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person.  And it is nothing less than sheer torture of the English language to suggest that a careful exploration of the outer surfaces of a person's clothing all over his body in an attempt to find weapons is not a 'search.'  Moreover, it is simply fantastic to urge that such a procedure performed in public by a policeman while the citizen stands helpless, perhaps facing a wall with his hands raised, is a 'petty indignity.'  It is a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly."); Weaver, 9 F.4th at 141-42 ("It is beyond dispute that [the defendant] has a right to the security of his person, and that . . . a search occurred when [the officer's] hands physically came into contact with [the defendant] during the frisk) (citations & internal quotations omitted)); Lauro v. Charles, 219 F.3d 202, 211 (2d Cir. 2000) (noting the "significant intrusion upon dignitary and privacy interests that occur when a person is physically handled by the police") (citation omitted)); United States v. Baltazar, 477 F. Supp. 236, 245 n.12 (E.D.N.Y. 1979) (noting that "every individual has the requisite standing to challenge a search of his own person"); see also Gardner v. United States, 680 F.3d 1006, 1010 (7th Cir. 2012) (finding that the defendant's reasonable expectation of privacy in his own person and clothing gave him the necessary privacy interest to support a challenge to the officers' pat down search of him as unconstitutional in the absence of reasonable suspicion to frisk); id. ("As [the defendant] has argued throughout this case, and as the government concedes, he had a reasonable expectation of privacy in his own person and clothing.  Thus, he certainly had the necessary privacy interest to support a challenge to the officers' patdown search of his pockets as unconstitutional on the ground that the officers lacked reasonable suspicion to frisk him.") (citation omitted)); United States v. Thornton, 493 F. Supp. 2d 1024, 1031 (S.D. Oh. 2007) ("Parenthetically, even though the [g]overnment has not raised the question, it is self-evident that the [d]efendant had a legitimate expectation of privacy in his person and, thus, may challenge the search of himself."); id. ("[T]he Fourth Amendment expressly provides that [the defendant] had a legitimate expectation of privacy in 'the invaded place,' his 'person.'").

Wyche, 307 F. Supp. 2d 453, 457 (E.D.N.Y. 2004); see United States v. Calvente, 722 F.2d

1019, 1023 (2d Cir. 1983) (holding that the government had the burden of proving that consent

for a warrantless search was given by a preponderance of the evidence); see also United States v.

Matlock, 415 U.S. 164, 178 n.14 (1974) ("[T]he controlling burden of proof at suppression

hearings should impose no greater burden than proof by a preponderance of the evidence.").

"Deciding whether that burden has been met is not a mechanical, quantitative exercise; rather,

the result turns on whether the trier of fact has been persuaded, even if only by the tiniest margin,

that the requisite facts have been established." United States v. Vazquez, 864 F. Supp. 2d 221,

237 (E.D.N.Y. 2012) (citations & internal quotation omitted).

Under Terry, police officers may stop "an individual for questioning if they have a

reasonable suspicion that criminal activity is afoot, and may frisk him if they reasonable believe

he is armed and dangerous." United States v. Elmore, 482 F.3d 172, 178 (2d Cir. 2007). The

Second Circuit has recently summarized the law pertaining to reasonable suspicion for a Terry

stop-and-frisk as follows:

> The reasonable suspicion standard is not high. It merely requires that a police
> officer be able to point to specific and articulable facts which, taken together with
> rational inferences from those facts, reasonably warrant that intrusion on the
> citizen's liberty interest. Reasonable suspicion requires less than the fair
> probability of wrongdoing needed to support probable cause, and it can arise from
> information that is less reliable. In determining whether an officer has an
> objective basis for his conduct, the [c]ourt must view the totality of the
> circumstances through the eyes of a reasonable and cautious officer on the scene,
> whose insights are necessarily guided by the officer's experience and training, as
> well as commonsense judgments and inferences about human behavior. A mosaic
> of factors can contribute to a basis for reasonable suspicion, including, among
> other things, the suspect's behavior, the context of the stop, and the crime rate in
> the area. The Supreme Court has consistently recognized that reasonable
> suspicion need not rule out the possibility of innocent conduct.

Weaver, 9 F.4th at 140 (citations & internal quotations omitted). "[W]hen reviewing the

constitutionality of a frisk for weapons, the [c]ourt must examine the facts that preceded the

36

frisk." Id. at 140-41.  "The standard takes into account the totality of the circumstances—the whole picture."  Id. at 141 (citation & internal quotation omitted).

In sum, where the government seeks to show that its officers had reasonable suspicion to perform a Terry stop-and-frisk, its proof must show by a preponderance of the evidence that the officers had reasonable suspicion that criminal activity was afoot and that the suspect was armed and dangerous.  See United States v. White, 298 F. Supp. 3d 451, 456 (E.D.N.Y. 2018) ("Once it is shown that a warrantless search was conducted, '[t]he burden then shifts to the government to show by a preponderance of the evidence that the police had . . . reasonable suspicion . . . to justify their actions.'" (quoting United States v. Levy, 217 F. Supp. 3d 643, 660 (E.D.N.Y. 2016)).

### b.  Reasonable-Suspicion Factors At Issue On The Instant Motion

On the instant motion, the Government argues that the following factors were relevant to the officers' reasonable suspicion to stop Mr. Andrews for the unlawful possession of a firearm and, by extension, to frisk him as potentially armed:  (1) Officer Schumacher's alleged observation of a bulge in Mr. Andrews's waistband, see United States v. Manuel, 64 F. App'x 823, 826 (2d Cir. 2003); (2) the officers' alleged observation of Mr. Andrews making a hand motion or gesture adjusting the area near his waistband where Officer Schumacher allegedly saw the bulge, see United States v. Padilla, 548 F.3d 179, 189 (2d Cir. 2008) (adjusting waistband); (3) the officers' alleged observation of Mr. Andrews's nervous or evasive behavior, see Illinois v. Wardlow, 528 U.S. 119, 124 (2000) (nervous or evasive behavior); and (4) the time of day at which the officers encountered Mr. Andrews, see United States v. Bayless, 201 F.3d 116, 134 (2d Cir. 2000) (noting that, in the presence of other suspicious factors, "sometimes innocuous factors such as the time of day . . . take on added significance").  The Government contends, and

37

Mr. Andrews does not dispute, that if the Government's evidence can establish the officers'

reasonable suspicion to believe that Mr. Andrews possessed a firearm by a preponderance of the

evidence, the fact "[t]hat New York state permits certain licensed individuals to carry concealed

weapons [would] not negate . . . reasonable suspicion that unlawful activity [may have been]

afoot" and that Mr. Andrews may have been armed, as officers are "entitled to draw on their

experience that far more individuals who carry concealed handguns do not have licenses than

do." United States v. Lucas, 68 F. App'x 265, 266-67 (2d Cir. 2003) (finding that officers are

"entitled to draw on their experience that far more individuals who carry concealed handguns do

not have licenses than do").

### i.  Alleged Observations Of A Bulge Suspected To Be A Firearm

#### 1.  Individual Observations Of A Suspected Firearm

"Cases where a 'bulge' in a suspect's clothing justifies a frisk require that the bulge's

size, shape and placement justify . . . the reasonable suspicion that the bulge is a weapon."

United States v. Jackson, No. 15 Crim. 106 (JPO), 2015 WL 4557401, at *11 (S.D.N.Y. July 29,

2015) (emphasis in original) (collecting cases) (finding that an officer's bulge observation did

not support reasonable suspicion that the defendant was armed and dangerous because the court

did not find that the "bulge was unusual or suspicious in any way").[19]  Although "reasonable

---

[19] See, e.g., Pennsylvania v. Mimms, 434 U.S. 106, 111-12 (1977) (finding that the officer's credited observation of a bulge in the defendant's jacket during a traffic stop permitted reasonable suspicion that the defendant was armed); United States v. Jones, 606 F.3d 964, 967 (8th Cir. 2010) (finding that officer lacked reasonable suspicion that the defendant was carrying a concealed firearm in his hoodie pocket, "as opposed to some other object" given, inter alia, his testimony that "he was unable to see the size or shape of whatever was in [the defendant's] hoodie pocket"); United States v. Wright, 582 F.3d 199, 212 (1st Cir. 2009) (finding that "the fact that [the defendant] clutched at [something heavy in] his pocket, even while in flight, cannot support an inference that the object he clutched was specifically a weapon"); Manuel, 64 F. App'x at 826 (finding reasonable suspicion from collective facts which including the officer's credited observation of a bulge in the front of the defendant's waistband from approximately five

suspicion is so fact-intensive that on-point precedent to control the outcome of a case will be

nearly impossible to find[,]" United States v. Strachon, 354 F. Supp. 3d 476, 486 (S.D.N.Y.

2018) (citation & internal quotations omitted), some case discussion is instructive for context for

issues relevant to Mr. Andrews's motion.

      For example, in United States v. Mayo, 960 F. Supp. 2d 419, 422 (E.D.N.Y. 2013), the

court declined to credit officer testimony that an alleged "split moment" glimpse permitted a

purported observation of a firearm in the defendant's waistband.  Among other things, the court

found that because the defendant was wearing a hoodie that hung below the waistband of his

pants by a couple of inches, "it would have draped down" over the handle allegedly seen.  Id.

The Mayo Court also found it incredible that the officers failed to discuss the alleged bulge

observation before exiting the car:

> Few things are more important to the safety of the public and especially of the
> police themselves when they stop a suspect than the presence of a firearm.  A
> firearm on the scene is a big deal even to the most experienced officers, and the
> cases evidencing that reality are legion.  The government would have [the court]
> believe that [an officer] saw a firearm in [the defendant's] waistband and then let
> [other officers] exit the car to stop him without even mentioning to them that the
> person they were about to stop was carrying a gun.

Mayo, 960 F. Supp. 2d at 423.

      The court in United States v. Price, No. 13 Crim. 216 (RRM), 2014 WL 558674, at *7

(E.D.N.Y. Feb. 11, 2014), similarly found an officer's testimony that he saw a bulge suspected to

be a firearm in the defendant's pocket "inherently and transparently false" under the totality of

the circumstances.  "Most important, the truth of [the officer's] claims [was] belied both by the

---

feet away); United States v. Grant, No. 07 Crim. 729 (SJ), 2008 WL 897805, at *5 (E.D.N.Y.
Mar. 31, 2008) (finding reasonable suspicion from collective facts which including the officer's
credited observation of a bulge that could be seen to have "the distinct shape of a handgun"
beneath the defendant's T-shirt and shorts).

clothing [the defendant] was wearing, and the shape of the gun itself." Id. at *8.  Citing its own

review of a photograph of the clothes, which were not themselves in evidence, the court found

the defendant's sweatshirt and pants oversized, "large and baggy, and drape[d] quite loosely

through [the defendant's] hips and legs, with several inches of material pooling at his ankles."

Id. at *9.  As a result, the court found that it was "simply hard to believe that any observer, even

a trained police officer, could make out the shape of any particular object in one of the pockets,

let alone determine that the object was of such non-rectangular and non-square shape as to rule

out a cell phone or wallet, even while [the defendant] was walking." Id.  Given that the gun

recovered was of a compact size, "[the officer] would be hard pressed to suggest that he could

actually see [its] outline" while seated in a car after dark "even under the best nighttime

circumstances." Id. at *8-9.

       United States v. Jones, No. 17 Crim. 103 (DLI), 2018 WL 1582217, at *4 (E.D.N.Y. Mar.

29, 2018), is another example in which the court rejected the government's alleged bulge-

observation evidence.  The Jones Court found the allegation incredible in the context in which it

was made, i.e.:

       The observations were made at night.  There was scant testimony about the
       quality of the light conditions that wintry night.  It is difficult to ascertain whether
       the light that there may have been illuminated [the d]efendant from behind or
       from the front.  Notably, [the d]efendant's arrest photo . . . showed [the
       d]efendant was wearing a large bubble jacket and bulky sweater, loosely lying
       over and outside his pants.  It is difficult to fathom how any officer could have
       seen the outline of a gun or a silver handle in the waistband through the clothes.

Id. at *5.  In similar fashion, in United States v. Floyd, No. 99 Crim. 234 (DAB), 1999 WL

673050, at *4 (S.D.N.Y. Aug. 30, 1999), the court also found the government's evidence

insufficient to establish the officers' bulge allegations.  "In addition to numerous inconsistencies

in the officers' testimonies," the Floyd Court found "it implausible that the officers, while

driving in a car ten to fifteen feet away, could have seen a bulge on Defendant's right side at 10:30 at night, at the end of December, when the gun is only three and a half inches tall and five inches long, lodged inside Defendant's dark blue pants and covered by a closed dark blue jacket."  Id.

### 2.   Collective Knowledge About A Suspected Firearm

Collective-knowledge or imputed-law doctrine is also relevant to the bulge allegation on the instant motion because Officer Schumacher was the only officer who allegedly observed a bulge in Mr. Andrews's waistband.  The doctrine asks whether the instigating officer on whose "information the actual searching . . . officers relied, had information that would provide reasonable suspicion" to search the suspect.  United States v. Colon, 250 F.3d 130, 135-36 (2d Cir. 2001).  If so, it may be appropriate to impute the instigating officer's information to the searching officer, although there may be circumstances where it would be inappropriate to do so, such as where "there is no evidence that an officer has communicated his suspicions with the officer conducting the search, even when the officers are working closely together at a scene." United States v. Hussain, 835 F.3d 307, 316 n.8 (2d Cir. 2016).  The Second Circuit has also considered a corollary question, which is whether "facts known to some members of the police force which exonerate an arrestee are ipso facto imputed to the arresting officer."  United States v. Valez, 796 F.2d 24, 28 (2d Cir. 1986).  The Valez Court held that although such exonerating facts are not ipso facto imputed to the arresting officer, "the issue is whether the failure to communicate these facts to the arresting officer rendered the mistaken arrest unreasonable."  Id. (declining to impute officer information that the true suspect was arrested to the defendant's arresting officer because it became known after the challenged seizure); see Jett v. State, No. A-12845, 2021 WL 1561542, at *7 (Alaska Ct. App. Apr. 21, 2021) ("Although the Second Circuit

was speaking about arrests, the same reasoning would apply in the investigative stop context presented by this case.  The issue is whether the failure of [another officer] to timely or adequately communicate additional facts to the arresting officer, or for the arresting officer to hear those facts, rendered the mistaken stop unreasonable.").  In other words, an instigating officer's knowledge of exculpatory facts pertaining to reasonable suspicion may be imputed to other officers for the purposes of determining the legality of their actions under the Fourth Amendment (as distinguished from determining those other officers' civil liability for a Fourth Amendment violation).  See Whiteley v. Warden, Wyo. State Penitentiary, 401 U.S. 560, 568 (1971) ("Certainly police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause.  Where, however, the contrary turns out to be true, an otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest."); United States v. Longmire, 761 F.2d 411, 420 (7th Cir. 1985) ("Unreasonable delays by issuing officers in updating the information contained in police bulletins or flyers . . . may render illegal stops and searches pursuant to those bulletins."); United States v. De Leon-Reyna, 898 F.2d 486, 489 (5th Cir. 1990) (finding that where the primary justification for a contested stop was "registration report that was completely erroneous due to the officer's negligence in transmitting the vehicle's license plate numbers," "reasonable suspicion cannot be grounded upon this type of information"); id. ("The government cannot bootstrap reasonable suspicion from an officer's good faith reliance on a radio report when the issuing agent . . . lacked reasonable suspicion."); Golphin v. City of New York, No. 09 Civ. 1015 (BSJ), 2011 WL 4375679, at *2 (S.D.N.Y. Sept. 19, 2011) ("When the collective-knowledge doctrine applies, the proper inquiry is whether the

42

arresting officer acted reasonably, as opposed to whether probable cause actually existed[.]")
(citing <u>Valez</u>, <mark>796 F.2d at 28</mark>).

### ii. Alleged Observations Of A Hand Motion Consistent With The Adjustment Of A Firearm

Under the requisite totality-of-the-circumstances analysis, a hand gesture's "distinctive consistency with the adjustment of a firearm" can contribute to reasonable suspicion that the individual may be armed even if the motion is also "consistent with conceivable innocent adjustments" of an everyday item such as a cellular telephone or wallet.  <u>Padilla</u>, <mark>548 F.3d at 189</mark> (citation & internal quotation omitted).  Once again, certain judicial decisions provide instructive context for Mr. Andrews's arguments about the hand-motion evidence in this case.

For example, in <u>Price</u>, the court disbelieved an officer's testimony about the defendant's hand gesture such that it did not show firearm-related clothing adjustment because it was inconsistent with the officer's prior statement about the nature of the observation.  <u>See Price</u>, <mark>2014 WL 558674</mark>, at *13.  "Most notably, while [the officer] told the grand jury that [the] defendant 'sort of touched' his right pants pocket 'at one point,' he testified at the hearing that '[n]umerous times [the defendant] kept on touching that heavy object in the right pants pocket.'" <u>Id.</u> (citations omitted).  When viewed alongside other incredible aspects of the record, which as discussed above included discredited officer testimony about a bulge, <u>see</u> Section II.b.i, <u>supra</u>, the <u>Price</u> Court found that such "differences amount[ed] to more than mere semantics[.]"  <u>Id.</u>; <u>see</u> <u>United States v. Doughty</u>, No. 08 Crim. 375 (RPP), <mark>2008 WL 4308123</mark>, at *6 (S.D.N.Y. Sept. 19, 2008) (finding that, in the absence of a credible bulge allegation, the officer's testimony about how the defendant looked adjusting his waistband "would not, standing alone, sufficiently elevate a reasonable officer's suspicions to the level" where a stop was justified).

The court in <u>United States v. McCrae</u>, No. 07 Crim. 772 (JG), <mark>2008 WL 115383</mark>, at *1

(E.D.N.Y. Jan. 11, 2008), also concluded that hand-motion evidence failed to establish reasonable suspicion that the defendant had a gun.  There, an officer testified that the defendant moved his hand "as if moving an object from the center of his stomach to the left side of his waistband."  Id.  Noting that the officer had made this observation from 30 feet behind the defendant and at 3:00 a.m., the McCrae Court held that although the officer could have been able to see the defendant making slight movements of his elbow and shoulder, this "was insufficient to raise a reasonable suspicion that [the defendant] was committing a crime, even when taken together with the fact that [the defendant] was present in a high-crime area at night and walked unhurriedly away when the police arrived."  Id. at *4.

In Jones, the court rejected the government's claim that its evidence showed that three officers observed the defendant making a hand motion around his waistband that, under the circumstances, raised suspicion of firearm possession.  See Jones, 2018 WL 1582217, at *4.  In its discussion of the officers' hand-motion testimony, the Jones Court noted that the officers in the vehicle failed to mention a firearm to each other or send such information out over police radio.  See id.  "None of the officers conveyed to the others that they thought [the d]efendant had a gun."  Id. (finding it "incredible that this possibility was not communicated") (citing and discussing Mayo, 960 F. Supp. 2d at 423).  "Given the officers' implausible testimony," which as discussed above also included incredible bulge-observation evidence, see Section II.b.i, supra, the Jones Court held "that [the d]efendant's waistband hand motions did not provide the officers with reasonable suspicion to stop him."  Id. at *5.  "At the time of the seizure, the officers lacked reasonable suspicion to stop [the d]efendant because they were relying entirely on [the d]efendant's hand motions around his waistband, and the fact that [the d]efendant turned away from the officers and continued to walk (not run) in the direction of his home."  Id. at *6.

44

### iii.   Alleged Observations Of Nervous And Evasive Behavior

A suspect's nervous behavior is "a pertinent factor in determining reasonable suspicion" under a totality-of-the-circumstances analysis, Wardlow, 528 U.S. at 124 (citations omitted), although nervous behavior alone is generally insufficient to establish reasonable suspicion in the absence of other suspicious evidence, see United States v. Hiruko, 320 F. Supp. 2d 26, 32 (E.D.N.Y. 2004) (finding the government's evidence of furtive gestures and nervous looks was alone deficient where the court did not credit testimony that an officer saw a bulge in the defendant's pocket or that the defendant was "fidgeting around right where the bulk was in his pants"); United States v. Parker, No. 99 Crim. 123 (JG), 1999 WL 997282, at *6 (E.D.N.Y. Oct. 18, 1999) (finding no basis for stop where the officer saw the defendant turn his view away from the officer and look back three times).  Courts have generally found nervousness to be "of limited significance in determining reasonable suspicion," particularly where not unusually severe and unaccompanied by other suspicious facts of sufficient weight.  See Jackson, 2015 WL 4557401, at *10 (collecting cases) (finding that the defendant's "nervousness," which was not unusually severe, to be of limited weight in reasonable-suspicion analysis); Floyd v. City of New York, 959 F. Supp. 2d 540, 614 (S.D.N.Y. 2013) (finding nervousness "standing alone" to be an inadequate basis "for seizing, questioning and potentially frisking a person under the Fourth Amendment"); Rivera, 543 F. Supp. 2d at 337 (finding no suspicious circumstances that might have reasonably justified the frisk because, inter alia, "[the officer] did not indicate that [the defendant] appeared nervous or frightened before the frisk," and when the officer approached the defendant, "[the defendant] turned right around").

A suspect's evasive behavior can also be a pertinent consideration in the totality-of-circumstances analysis.  See Wardlow, 528 U.S. at 124; Jackson, 2015 WL 4557401, at *11 ("A

finding of reasonable suspicion cannot be supported primarily from the fact that [the suspect] was turned away from the officers").  Yet, cases finding evasive behavior generally "describe behavior that is out of the ordinary for some reason other than the mere arrival of officers when the conduct begins."  McCrae, 2008 WL 115383, at *3 (collecting cases); see Florida v. Bostick, 501 U.S. 429, 437 (1991) ("[R]efusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure."); United States v. Muhammad, 463 F.3d 115, 123 (2d Cir. 2006) ("An individual approached by an officer who has no reasonable suspicion of wrongdoing may ignore the officer and go about his business, and his refusal to cooperate may not form the basis for his detention."); Rivera, 543 F. Supp. 2d at 337-38 (finding that where no other evidence established that the defendant might have had a concealed weapon, the defendant's allegedly evasive behavior as described was not suspicious: "When [the defendant] waved off the unmarked [police] car, [the officer] testified that [the defendant] turned around and proceeded to walk . . . northbound on the sidewalk, but never testified that [the defendant] rushed or hurried away.").  "[C]almly walk[ing] away" is not alone suspicious.  McCrae, 2008 WL 115383, at *3 (finding that the fact that the defendant walked directly away from an officer in a high-crime area was not an evasive "change of direction": "People who are standing start walking all the time.  Inevitably, sometimes it will happen with police officers around."); see United States v. Goines, 604 F. Supp. 2d 533, 542 (E.D.N.Y. 2009) (finding incredible officer testimony that the defendant ran away and holding that "[t]he bare fact that [the defendant] tried to leave the scene cannot create reasonable suspicion or probable cause").  On the other hand, courts have found that an individual's change in direction or speed can contribute to suspiciousness (and headlong running flight particularly so).  See United States v. Williams, 608 F. Supp. 2d 325, 329 (E.D.N.Y. 2008) (collecting cases); id. at 330 ("While [the

46

defendant's] prior behavior may not have been suspicious, [the fact that he ran away from uniformed police officers] falls squarely within the category of 'headlong flight.'  Even assuming that [the defendant] did not, as [the officer] testified, turn and reach for an object in his waistband, his flight—coupled with [other facts]—provided at least a reasonable suspicion sufficient to justify" a subsequent stop.); id. at 329 (distinguishing a mere failure to cooperate, which an individual approached by an officer without reasonable suspicion of wrongdoing has the right to do, from unprovoked headlong flight).

### c.  Appraisals Of Officer Credibility

As some of the above-cited cases show and as relevant here, where reasonable-suspicion evidence requires an appraisal of a police officer's testimony about his observations of an individual, courts may take into account the officer's ability and opportunity to see the things claimed at relevant times.  Considerations include the duration of the officer's viewing, the distance between the officer's surveillance and the individual's position, the lighting and weather conditions, any obstructions to the officer's view that may have existed, and any other relevant factors.  See, e.g., Price, 2014 WL 558674, at *3 (finding in its discussion of the officers' ability to observe that "the government failed to present meaningful credible evidence to support the officer's ability to see what they claimed they saw"); id. at *7 ("Lighting conditions are critical to an officer's ability to observe[.]"); Scott v. Connolly, No. 11 Civ. 953 (PKC) (LB), 2014 WL 354253, at *14 (E.D.N.Y. Jan. 30, 2014); Haider v. Director of Corr., 992 F. Supp. 1192, 1195 (C.D. Cal. 1998); People v. Taylor, 610 N.Y.S.2d 30, 31 (1st Dep't 1994); People v. Clark, 501 N.Y.S.2d 734, 736 (2d Dep't 1986); People v. Daniels, 453 N.Y.S.2d 699, 704 (2d Dep't 1982); People v. Gardner, 399 N.Y.S.2d 146, 147 (2d Dep't 1977).  Generally, "a police officer's testimony should be evaluated in the same manner as the testimony of any other witness,"

47

although consideration may be given to officers' special training or experience when appropriate.

People v. Pascullo, 502 N.Y.S.2d 275, 277 (2d Dep't 1986); see, e.g., United States v. Moore,

No. 10 Crim. 971 (RJH), 2011 WL 6325973, at *5 (S.D.N.Y. Dec. 19, 2011) (noting that an

officer's special training may be relevant to an assessment of his testimony about a speeding

observation); Wells v. Mantello, No. 90 Civ. 544 (DRH), 1992 WL 189477, at *1 (E.D.N.Y. July

17, 1992) (noting its instruction that police officer testimony "is to be judged in the same way as

the testimony of a civilian, . . . a police officer is entitled to no extra measure of credibility solely

because of his status as a police officer"); Hodge v. Henderson, 761 F. Supp. 993, 1005

(S.D.N.Y. 1990) (noting charge that the jury should use the "same yardstick" in evaluating the

officers' credibility as they would apply to any other witness).

An officer's credibility may also depend upon his testimony's inconsistency with prior

statements the officer has made, other officers' testimony, documentary evidence and more.  See

United States v. Shine, No. 17 Crim. 28 (FPG) (JJM), 2019 WL 2442145, at *4 (W.D.N.Y. June

12, 2019) (adopting report and recommendation, and finding that the government failed to show

by a preponderance of the evidence that there was reasonable suspicion for stop because, inter

alia, an officer's hearing testimony was inconsistent with his grand jury testimony and

photographs from his body camera); Price, 2014 WL 558674, at *11 (noting that two officers'

"significantly conflicting accounts of what occurred" suggested incredibility and potentially that

one manufactured testimony); United States v. Robles, 253 F. Supp. 2d 544, 549 (S.D.N.Y.

2003) (declining to credit officers' account where their testimony was inconsistent as to facts

pertaining to an alleged stop); United States v. Kiyuyung, No. 97 Crim. 1180 (JFK), 1999 WL

435143, at *5 (S.D.N.Y. June 25, 1999) (finding an officer's suppression hearing testimony

incredible due to its inconsistency with a report the officer had prepared and his earlier grand

48

jury testimony).

An officer's reputation for truthfulness may also be relevant when called into question by evidence of prior adverse credibility findings against him.  See Price, 2014 WL 558674, at *3.  Facts pertinent to the weight and relevance of any such evidence include:  "(1) whether the lie was under oath in a judicial proceeding or was made in a less formal context; (2) whether the lie was about a matter that was significant; (3) how much time had elapsed since the lie was told and whether there had been any intervening credibility determination regarding the witness; (4) the apparent motive for the lie and whether a similar motive existed in the current proceeding; and (5) whether the witness offered an explanation for the lie and, if so, whether the explanation was plausible."  United States v. Cedeno, 644 F.3d 79, 83 (2d Cir. 2011) (collecting cases).

Courts have differed with respect to the evidentiary consequences of an officer's failure to activate a body camera as required during a law enforcement operation.  Some courts have found that such a failure does not constitute prima facie evidence of bad faith; some have found that a failure to activate deprives the court of the best evidence available and may permit the officer's testimony to be rejected; and some have found that a failure to activate can be a factor in assessing an officer's credibility.  See generally United States v. Garcia, -- F. Supp. 3d --, No. 19 Crim. 410 (FB), 2021 WL 3516447, at *7-8 (E.D.N.Y. Aug. 10, 2021) (collecting cases) (granting motion to suppress upon finding that officer's failure to activate his body camera deprived the court of "the best and dispositive evidence in this case," such that "the [g]overnment has failed to sustain its burden of proof to justify its warrantless entry").

### d.  The Exclusionary Rule And Post-Arrest Statements

Generally, where a stop-and-frisk is found to have violated the Fourth Amendment, evidence seized in connection with the encounter may be suppressed under the exclusionary rule

49

"to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures."  United States v. Calandra, 414 U.S. 338, 347 (1974); see Jones, 2018 WL 1582217, at *7 ("As there was no reasonable suspicion to stop [the d]efendant in the first instance, any physical evidence seized from him must be suppressed.  In addition, as the stop was unlawful, any statements made by [the d]efendant as a result, must also be suppressed as a product thereof.") (citations omitted)); United States v. Bristol, 819 F. Supp. 2d 135, 142 (E.D.N.Y. 2011) (finding that if the government fails to satisfy its "burden of proving, by a preponderance of the evidence, that reasonable suspicion existed for a stop[,]" then "any evidence obtained as a result of an improper seizure—that is, a stop or frisk that is not supported by reasonable suspicion—must be excluded from trial") (citations & internal quotations omitted)).  Although case law recognizes some exceptions to the application of the exclusionary rule such as when a Fourth Amendment violation did not involve unlawful police conduct, "[w]hen the police exhibit deliberate, reckless or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs."  Davis v. United States, 564 U.S. 229, 238 (2011) (internal quotation marks omitted); see Herring v. United States, 555 U.S. 135, 146 (2009) (noting that if the police were found to have "knowingly made false entries [in a warrant system] to lay the groundwork for future false arrests," exclusion would be warranted); Illinois v. Krull, 480 U.S. 340, 348-49 (1987) ("[E]vidence should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.") (citation & internal quotation marks omitted)); United States v. Campbell, 603 F.3d 1218, 1229 (10th Cir. 2010) (noting that "the police may not insulate one officer's deliberate misstatement or material omission simply by relaying it

50

through an officer-affiant personally ignorant of its falsity or existence"); United States v. Wapnick, 60 F.3d 948, 956 (2d Cir. 1995) (holding that when an informant "is himself a government official, a deliberate . . . omission can . . . serve as grounds for . . . suppression").

Post-arrest statements, including confessions, may be excluded from evidence as "fruit of the poisonous tree" where a stop-and-frisk was unconstitutional. Wong Sun v. United States, 371 U.S. 471, 485-86 (1963) (holding that verbal evidence obtained through a Fourth Amendment violation may be excludable); see United States v. Vasquez, 638 F.2d 507, 527 (2d Cir. 1980) (holding that because an entry and arrest were unlawful, the defendant's "post arrest statements must be suppressed"); United States v. Morris, No. 07 Crim. 29 (NG) (JO), 2007 WL 4351427, at *9 (E.D.N.Y. Dec. 12, 2007) (finding that, where the government failed to meet its burden to establish the lawfulness of a stop by a preponderance of the evidence, the exclusionary rule "require[d] suppression . . . not only of the gun that [the officer] discovered . . . but also of [the defendant's] later admission that the gun was his"); Hiruko, 320 F. Supp. 2d at 34 (suppressing post-arrest statements made approximately one hour after Fourth Amendment violations as tainted); United States v. Person, 134 F. Supp. 2d 517, 527 (E.D.N.Y. 2001) ("[The defendant's] post-arrest statements should also be excluded because of the impropriety of the original stop and the violation of his Fourth Amendment rights."). Although there may be circumstances in which sufficient attenuation may be shown between an unlawful stop-and-frisk and an individual's post-arrest statements such that post-arrest statements need not be suppressed due to a Fourth Amendment invasion, "[d]emonstrating such purgation is, of course, a function of circumstantial evidence, with the burden of persuasion on the State." Kaupp v. Texas, 538 U.S. 626, 633 (2003) (citation omitted); see United States v. Guzman, 724 F. Supp. 2d 434, 444 (S.D.N.Y. 2010) ("The burden of providing the statements were sufficiently attenuated to

remove the taint from the unlawful search is on the government."); Hiruko, 320 F. Supp. 2d at 34

(finding that the defendant's successful motion to suppress firearm evidence also required

suppression of his post-arrest statements where the government did not "allege[] an intervening

event"). "Relevant considerations include observance of Miranda, the temporal proximity of the

arrest and the confession, the presence of intervening circumstances, and, particularly, the

purpose and flagrancy of the official misconduct." Kaupp, 538 U.S. at 633 (citation & internal

quotations omitted). Alone and per se, the giving of Miranda warnings do not break the causal

connection between the illegality and the confession. See id.; Hiruko, 320 F. Supp. 2d at 35

("Miranda warnings alone do not erase the taint[.]").

## III.    Proposed Findings Of Fact

This Court makes the following proposed findings of fact for the reasons explained

below:

- The Government's evidence does not show by a preponderance of the evidence that Officer Schumacher observed a bulge in the front of Mr. Andrews's waistband. See Section III.a, infra.

- The Government's evidence does not show by a preponderance of the evidence that the officers observed Mr. Andrews make a suspicious hand motion. See Section III.b, infra.

- The Government's evidence shows by a preponderance of the evidence that Mr. Andrews slowed down, looked around, stopped and walked back towards the corner of Livonia and Pennsylvania Avenues. See Section III.c, infra. The Government's evidence does not show by a preponderance of the evidence that Mr. Andrews's behavior was nervous or evasive. See id.

- The Government's evidence shows by a preponderance of the evidence that the incident occurred at night. See Section III.d, infra.

### a.    The Government's Evidence Does Not Show By A Preponderance Of The Evidence That Officer Schumacher Observed A Bulge In The Front Of Mr. Andrews's Waistband

The Government's evidence does not show by a preponderance of the evidence that

Officer Schumacher observed a bulge in the front of Mr. Andrews's waistband.

Officer Schumacher was the only officer who allegedly saw the bulge on Mr. Andrews's body.  The Court finds that he did not see a bulge for at least four reasons.  First, body-camera footage in evidence shows that the crosswalk where Officer Schumacher alleges to have made the bulge observation was dimly lit at the time.  See Section I.a.iv, supra; Exh. 2.2 at 1:18:50-19:00, 1:21:41-1:22:46 (Vitale body-camera footage).  This footage is the best evidence of the lighting conditions at the relevant time because it was actually taken at the time of the incident when corner stores near the crosswalk were closed and dark.  As noted above, the Government's screen shots from body-camera footage showing what it looked like to gaze directly into the bulbs of nearby light sources is not helpful.  See Section I.a.iv, supra, ECF No. 94 at 2.  The better evidence is the footage showing whether and to what extent these and other lights illuminated relevant areas.  In the crosswalk, it was not much.  See Exh. 2.2 at 1:18:50-19:00, 1:21:41-1:22:46 (Vitale body-camera footage).  Second, Officer Schumacher had a few seconds at most while driving past Mr. Andrews who was in the dimly lit crosswalk to make the alleged bulge observation before losing his sightline when Mr. Andrews disappeared behind the car's back pillar.  See Section I.b.ii, supra; Exh. J.12.  In the middle of this already fleeting moment, Officer Schumacher's sightline was interrupted by Officer Vitale's body and the middle passenger-side vehicle pillar.  See Section I.b.ii, supra.  Third, Mr. Andrews's heavy sweatshirt was made of thick sweat material, had a front pocket and hung over the front waistband of Mr. Andrews's pants.  See Section I.a.vii, supra; Exhs. 3-5; Exh. 2.2 at 1:19:10-1:19:26 (Vitale body-camera footage).  The sweatshirt was not flush with Mr. Andrews's body because he had a scarf at his neck and under the sweatshirt.  See Tr. 18:9-2 (Vitale testifying from Exhibits 3-5 that Mr. Andrews's scarf was wrapped up and under his hooded sweatshirt "like on his chest), 111:9-10

53

(Schumacher); Exh. 2.2 at 1:19:05 (Vitale body-camera footage).  To the extent that the Government asks this Court to credit Officer Schumacher and Officer Vitale's testimony that Mr. Andrews's shirt was thin and form fitting, the photographs and body-camera footage in evidence show this is not correct.  See id.  Fourth, to the extent the record suggests that the alleged bulge observed was the firearm ultimately retrieved, the small size of the firearm (approximately 5 inches long at its longest and 3.75 inches high at its highest) is a factor to consider in assessing whether Officer Schumacher could have observed it under the conditions described.  The gun lacks a solid straight edge or heft that might have formed the alleged bulge described by Officer Schumacher.  See Section I.b.xvi, supra; Tr. 110:18-22, 113:2-4 (Schumacher) ("[I]t had a straight line on top of it with two distinct ends on either side of it."), 257:11-258:11 (Miller); Exhs. J.1-J.2.

This evidence fails to show that Officer Schumacher had adequate time or opportunity to make the alleged observation of a bulge in the front of Defendant's waistband, much less one that an objectively reasonable officer would suspect to be a firearm.  At best, Officer Schumacher had a momentary glimpse of Mr. Andrews in the crosswalk under dim light while Officer Schumacher was driving a moving car.  See Mayo, 960 F. Supp. 2d at 422 (discussing implausibility of split moment glimpse of a weapon under conditions at issue).  Officer Schumacher's testimony is particularly implausible in that he claims that he both made direct eye contact with Mr. Andrews while driving and looking out the passenger-side window across Officer Vitale and that he observed an alleged bulge in the front of Mr. Andrews's waistband through the fabric of Mr. Andrews's sweatshirt during these seconds while driving a car at night. See Price, 2014 WL 558674, at *9 (finding it incredible that the officer could make out shapes described through the defendant's clothes "from a distance, while seated in a car, at close to

midnight, even under the best of nighttime circumstances"); United States v. Smith, No. 11

Crim. 677 (SJC), 2012 WL 1658063, at *3 (N.D. Ill. 2012) (finding it implausible that an officer

was able to see "the three (3) inch handle of a dark handgun against [the defendant's] dark shirt

from a distance of 25 feet, in a moving car, at night"); Floyd, 1999 WL 673050, at *4 (finding it

implausible that officers, while driving in a car ten feet away at night, could have seen a gun

measuring 3.5 by 5 inches lodged inside the defendant's dark pants and covered by a closed

jacket).

Officer Schumacher's testimony about Mr. Andrews's thin and form-fitting shirt shifting

on his body with each step to reveal the bulge's contours is also incredible; the shirt is not thin or

form-fitting, and Officer Schumacher did not have enough time in the mere seconds of his

nighttime observation while driving a car to see Mr. Andrews's shirt fabric moving as he

described.[20]  See Price, 2014 WL 558674, at *9 (finding from its own review of a photograph of

the defendant's clothing that it was hard to believe that any observer could make out the shape of

any particular objects in one of the defendant's pockets given the clothing's loose material); see

also People v. Rhames, 149 N.Y.S.3d 550, 514-15 (2d Dep't 2021) (holding that testimony

which is unbelievable because it is physically impossible or contrary to experience is to be

disregarded as being without evidentiary value); People v. Johnson, 113 N.Y.S.3d 294, 297 (3d

---

[20] It should also be noted that Officer Schumacher's own initial actions upon exiting the vehicle were inconsistent with his claim that he had seen a bulge in the front of Mr. Andrews's waistband that he suspected was a firearm.  If Officer Schumacher had suspected that Mr. Andrews had had a bulge that was a firearm in his waistband, one would expect that his immediate priority at the incident scene would have been to ensure the safety of the public and police by providing backup for Officer Vitale in case Mr. Andrews remained armed and dangerous.  Instead, Officer Schumacher walked westbound past Officer Vitale and Mr. Andrews to see if he could find a discarded firearm over which Mr. Andrews would not have had any immediate control.  "In short, [Officer Schumacher] acted like he had not seen the bulge he now claims to have seen."  Hiruko, 320 F. Supp. 2d at 29.

Dep't 2019) (collecting cases for the proposition that testimony may be inherently unworthy of belief if, inter alia, it demonstrates physical impossibility or is contrary to human experience); People v. Lebron, 585 N.Y.S.2d 498, 501 (2d Dep't 1992) ("The officer's claim that, from the distance of a foot, he was able to see into the defendant's six or seven-inch-deep pocket . . . and observe a metal object strains credulity.  Where a testifying officer claims to have seen that which common sense dictates could not have been seen, courts have repeatedly deemed this testimony patently tailored to meet constitutional objections.") (citations omitted)).[21]  Officer Schumacher's testimony that individuals often carry firearms in their waistbands does not alter the Court's assessment because this Court disbelieves that Officer Schumacher had a plausible opportunity to see a bulge in Mr. Andrews's waistband.

Accordingly, the Government has not proven that Officer Schumacher observed the alleged bulge.

Relatedly, the Government's evidence also fails to show by a preponderance that Officer Schumacher told Officer Vitale and Officer McCurry that he had seen a bulge in Mr. Andrews's waistband prior to the stop for at least three reasons.  First, when Officer Vitale began frisking Mr. Andrews, he began by frisking Mr. Andrews's chest and torso, and not Mr. Andrews's waistband or pants where Officer Schumacher allegedly observed the bulge.  See Section I.b.xiv-xv, supra.  Although Officer Vitale testified that this was for safety reasons because he did not want Mr. Andrews to know that the officers suspected that Mr. Andrews had a firearm in his waistband/pants while Officer Vitale was interacting with Mr. Andrews alone, the explanation is

---

[21] Given this Court's disbelief of the bulge-observation evidence for the reasons discussed, it need not consider whether and to what extent the sufficiency of Officer Schumacher's testimony is further diminished by virtue of the evidence of substantiated CCRB findings against him.  See Section I.b.xix, supra.

incredible because Officer Vitale then proceeded to frisk Mr. Andrews's pants while he remained alone with Mr. Andrews, and Officer Schumacher and Officer McCurry were to their west allegedly looking for discarded contraband.  See id.; Mayo, 960 F. Supp. 2d at 424 (noting the relevance of an officer's actions during a stop to what the officer allegedly knew at the time: "[I]t is telling that when [the officer] got out of the car to stop [the defendant], she did not draw her weapon, . . . a curious police practice when seizing an armed suspect on an empty street at night unless, as I find, she did not know when she stopped him that he was armed."); Hiruko, 320 F. Supp. 2d at 29 (disbelieving an officer's claim that he observed a bulge that he thought might be a gun because the officer "acted like he had not seen the bulge he now claims to have seen"); Kiyuyung, 1999 WL 435143, at *5 (noting an officer's illogical testimony that he walked past an open closet without looking inside during an alleged protective search for weapons, for which the officer offered no explanation); see also Smith, 2012 WL 1658063, at *3 ("The court finds it highly unlikely that a trained police officer would engage in physical wrangling with an armed defendant instead of first disarming the defendant.").  This Court draws the reasonable inference from this evidence that, at the time Officer Vitale began frisking Mr. Andrews's chest, Officer Schumacher had not told Officer Vitale that he had seen an alleged bulge in Mr. Andrews's waistband.  Cf. United States v. Alleyne, -- F. Supp. 3d --, No. 20 Crim. 266 (AMD) (RER), 2021 WL 5496044, at *9 (E.D.N.Y. Nov. 23, 2021) (finding that "focusing on the defendant's waist and groin area and confining the frisk to that area" corroborated the officer's testimony about his "initial observations of the defendant appearing to have put something in his waist area").

Second, all three officers testified that they could not recollect anything specific about what Officer Schumacher told his colleagues about the bulge or, in the case of Officer McCurry,

when Officer Schumacher said he had seen one.  See Section I.b.iii, supra; Jones, 2018 WL 1582217, at *4 (finding it incredible that the "officers failed to communicate to each other the possibility that [the d]efendant had a concealed firearm"); Mayo, 960 F. Supp. 2d at 423 (finding one undisputed fact "to dwarf all others" in finding the government's evidence insufficient to show that a firearm was observed in the defendant's waistband before exiting their vehicle, i.e., their silence about that critically important fact); see Price, 2014 WL 558674, at *12 (noting the credibility concerns raised when an officer "curiously suffer[ed] from memory lapses on simple but critical facts").  The lack of specificity in Officer McCurry's testimony about the content or timing of Officer Schumacher's bulge allegation means his testimony has no value because of its vagueness.  See Section I.b.iii, supra.  The evidentiary value of Officer Vitale's testimony that Officer Schumacher reported seeing the alleged bulge fares even worse because it was impeached in part by the fact that Officer Vitale "just interpreted" Officer Schumacher as saying that the bulge was L-shaped in a police report on the day of the incident when Officer Schumacher had not actually said this.  See id.  The interpretive license taken by Officer Vitale on the report with respect to Officer Schumacher's alleged bulge observation could have been because Officer Schumacher had not said anything about a bulge in Mr. Andrews's waistband at all.  This Court draws this inference because it is corroborated by the illogical progression of Officer Vitale's frisk beginning at Mr. Andrews's chest.  "Moreover, although equipped with [a radio], at no time did any of the officers call over the radio to inform area officers" that a bulge had been observed on Mr. Andrews that was suspected to be a firearm.  Jones, 2018 WL 1582217, at *4.  The record evidence is that the first such radio communication was made after Mr. Andrews's arrest.  See Section I.b.xvii, supra.

In light of this Court's finding that the Government has failed to show by a preponderance

58

of the evidence that Officer Schumacher observed a bulge in the front of Mr. Andrews's waistband, the alleged bulge observation is not a factor that contributes to the totality of the circumstances in this Court's reasonable-suspicion analysis.  The Government argues that the alleged fact, even if false, could still contribute to Officer Vitale's reasonable suspicion to stop and frisk Mr. Andrews if Officer Schumacher told his colleagues that he saw an alleged bulge and Officer Vitale relied on Officer Schumacher's report.  As a preliminary matter, the Government's argument fails because, as discussed above, its evidence insufficiently shows that Officer Schumacher told his colleagues that he saw the alleged bulge.  Even if Officer Schumacher had, the Government's argument still fails because this Court finds that Officer Schumacher had no opportunity to see one and such a false statement could not contribute to reasonable suspicion for the stop-and-frisk.  See Valez, 796 F.2d at 28 (finding that the question regarding whether an instigating officer's exonerating facts may be imputed to the arresting officer is whether the instigating officer's failure to communicate these facts to the arresting officer rendered the mistaken arrest unreasonable); see also Whiteley, 401 U.S. at 568 (finding that, although officers are entitled to assume that an instigating officer had the requisite information to support a police action, "where . . . the contrary turns out to be true, an otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest"); Colon, 250 F.3d at 135-36 (noting that imputed-knowledge law asks whether the instigating officer on whose information searching officers relied had information that would provide reasonable suspicion).

> **b.  The Government's Evidence Does Not Show By A Preponderance Of The Evidence That The Officers Observed Mr. Andrews Make A Suspicious Hand Motion**

The Government's evidence does not show by a preponderance of the evidence that the

officers observed Mr. Andrews make a suspicious hand motion.

A confluence of distance, darkness and physical obstructions impeded the officers' alleged view of Mr. Andrews allegedly making hand motions at the relevant time.  See Section II.c, supra (discussing law pertaining to factors bearing on a witness's ability to see things claimed).  The officers' view from their vantage point could not have been "pretty good" as Officer Schumacher testified.  The view was poor.  See People v. Heath, 625 N.Y.S.2d 540, 520-21 (1st Dep't 1995) ("The arresting officer's testimony that he observed [the] defendant exchanging a 2-inch glass vial with a dark top, from a distance of approximately 74 feet, from a moving patrol car, after dark, is, in our view, contrary to common experience and, as such, was incredible as a matter of law and did not support the verdict.") (citations omitted).  First, it is implausible that Officer Schumacher and Officer Vitale made their alleged observations of Mr. Andrews's hand motions from their vantage point in a car on the corner of Livonia and Sheffield Avenues at least 168 feet from where Mr. Andrews stood on the far side of the wrought-iron enclosures.  See Section I.a.v-vi, supra; Tr. 263:4-165:19 (Miller); Exhs. J.3-J.5.  Body-camera footage taken at the time of the incident shows how poor the lighting was in Mr. Andrews's location at the relevant time, which this Court credits over the Government's submission of isolated screen shots from the footage from when the camera lens was facing directly into the bulbs of nearby light sources.  See Section I.a.v, supra.  Photographs in evidence of the officers' sightline show just how problematic this combination of distance and darkness were to their ability to make any observations of Mr. Andrews's movements from the officers' location inside the car on the corner of Livonia and Sheffield Avenues.  See Exhs. J.3-J.5; Section I.a.vi, supra. In the forefront of the photographs there is ambient light, but the wrought-iron enclosures beyond which Mr. Andrews was standing (on the far side of the red awning in the photographs)

are shrouded in dark shadows.  See Exhs. J.3-J.5.  Officer Schumacher's testimony that the

corner space in the forefront of these photographs may have had different, brighter interior lights

is immaterial to this conclusion.  See Tr. 157:18-160:11 (Schumacher).  Even if true, brighter

light in the corner space at the forefront of the photographs would not have changed the lighting

conditions at the wrought-iron enclosures and eastward.  See Exhs. J.3-J.5.  The photographs

themselves show a sharp demarcation between the light of the corner and the dark conditions that

begins well before the wrought-iron enclosures' position.  See Section I.a.vi, supra; Exhs. J.3-J.5.

Second, the Government's evidence does not show by a preponderance of the evidence

that their location in the car on the corner of Livonia and Sheffield Avenues provided the officers

with an unobstructed view of Mr. Andrews as he stood against the roll-down gate on the far side

of the wrought-iron enclosures.  It is undisputed that Officer Schumacher and Officer Vitale at

least made their alleged observations of Mr. Andrews making a hand motion through the bars of

the wrought-iron enclosures.  See Sections I.a.v-vi, I.b.v-vii, supra.  The wrought-iron enclosures

alone impeded their ability to make the alleged hand-motion observations from inside the car 168

feet away and at night.  See Exhs. J.3-J.5.  Yet there were other obstructions, too.  Body-camera

footage taken at Mr. Andrews's location just minutes later shows what appears to be a chair, a

shopping cart and more detritus on the immediate eastern edge of the wrought-iron enclosures.

See Section I.a.vi, supra; Exh. 2.4 at 1:20:31-1:20:33, 1:20:40-1:20:45, 1:20:48-1:20:55

(McCurry body-camera footage).  Thus, the officers' ability from the stopped car at least 168

feet away from Mr. Andrews to make alleged observations of Mr. Andrews making hand

motions on the far side of the wrought-iron enclosures would have been further obstructed at

least in part by the large items.  See Price, 2014 WL 558674, at *7 ("[The officer] necessarily

could not have had an unobstructed view of [the defendant's] movements down the sidewalk as

the parked cars and other fixed objects would have obscured [the defendant's] journey—
particularly the lower half of [the defendant's] body, including the sagging pocket allegedly
containing the heavy object.").  This Court notes that Officer Schumacher and Officer Vitale
testified that they could not remember garbage cans or bags obstructing their sightline at the
time.  Although that testimony was in response to questions that never specifically asked about a
large shopping cart, at a minimum, it is concerning that neither officer offered to mention the
presence of other items such as the shopping cart as relevant to this aspect of the examination.
See id. at *12 (noting an officer's "credibility issues" because he "curiously suffer[ed] from
memory lapses on simple but critical facts that would harm his case, and in response to
unfavorable questions"); People v. Stroud, 159 N.Y.S.3d 787, 789-90 (4th Dep't 2021) (finding
the "significant inconsistencies and gaps in memory in the testimony of the police officers who
testified at the [suppression] hearing bear negatively on their overall credibility").  In a report
that Officer Vitale wrote on the date of the incident he did not mention these objects, either,
stating that Mr. Andrews "moved behind a see-through fence and began adjusting his
waistband."  See Tr. 64:6-9 (Vitale); ECF No. 98 at 11.  Taking the distance, darkness and
obstructions together, this Court finds that the Government's evidence does not show by a
preponderance of the evidence that Officer Schumacher and Officer Vitale made reliable
observations from their car on the corner of Livonia and Sheffield Avenues of Mr. Andrews
making alleged hand motions suspected to involve a firearm as Mr. Andrews stood against the
roll-down gate on the far side of the wrought-iron enclosures.

    Even if the officers' alleged observations were not so materially undermined by distance,
darkness and obstruction that rendered their ability to make them implausible at the relevant
time, the Government's evidence fails to show by a preponderance that Mr. Andrews made any

one of the different versions of the hand motion claimed by the officers (and, in the case of

Officer Schumacher, that an objectively reasonable officer would have suspected the allegedly

observed motion to have been distinctly consistent with the handling of a firearm).  First, Officer

Schumacher testified with reenactment that although he saw Mr. Andrews's shoulder dip as he

made a hand motion down and up near the front of his waistband at the center of his body, he

could not say whether Mr. Andrews's hand was inside or outside of his pants at the time or

whether Mr. Andrews grabbed anything.  See Section I.b.vii, supra.  Given that this Court finds

that Officer Schumacher did not see a bulge in the front of Mr. Andrews's waistband, there is

cause to disbelieve Officer Schumacher's hand-motion testimony as well.  See Siewe v.

Gonzales, 480 F.3d 160, 171 (2d Cir. 2007) (calling falsus in uno, falsus in omnibus "a natural

and instinctive tool of the factfinder, like a carpenter's hammer or plumber's wrench").  Even if

that were not the case, it is difficult to determine what objectively reasonable suspicion Officer

Schumacher's hand-motion testimony could support with the bulge allegation out of the picture

given Officer Schumacher's uncertainty and lack of specificity regarding what the hand motion

allegedly was.[22]  See Padilla, 548 F.3d at 184 (finding that even a potentially innocuous

adjustment could be suspicious if it had distinctive consistency with the adjustment of a

firearm).[23]

---

[22] This same issue—the fact that the Government has not sufficiently shown that Officer
Schumacher's alleged bulge observation occurred or that he said anything about it to the other
officers—also affects whether and to what extent an objectively reasonable officer would suspect
hand motions allegedly observed by Officer Vitale and Officer McCurry showed Mr. Andrews
handling a firearm.  Because the Government fails to establish Officer Vitale's or Officer
McCurry's alleged hand-motion observations by a preponderance of the evidence, it need not
reach what suspicion might have been drawn from such motions had they occurred.

[23] Officer Schumacher's testimony that he was uncertain about whether he suspected that Mr.
Andrews's hand motion showed him retrieving a gun is shown elsewhere in the record.  As
discussed above, Officer Schumacher's initial actions when exiting the vehicle after Officer

Second, Officer Vitale's testimony and demonstration to the Court that he saw Mr.

Andrews shoving his arm deep inside his pants all the way to his elbow is unsupported in the

record and cannot be found to have occurred by a preponderance of the evidence.  Officer

Vitale's reenactment of Mr. Andrews's alleged movement was exaggerated, which was

inconsistent with Officer Vitale's prior written statement (made on the day of the incident)

describing Mr. Andrews's movement as "adjusting his waistband" and Officer Vitale's prior

interview statement (made two weeks after the incident) that Mr. Andrews's motion was like that

of tucking in a shirt.  See Section I.b.vii, supra; Tr. 60:21-25, 63:22-64:10 (Vitale).  In sum,

Officer Vitale's testimony that he observed Mr. Andrews shoving his arm inside his pants up to

his elbow was incredible because on this record it appeared to be an embellishment to explain

how he could have possibly seen Mr. Andrews make a hand motion from the car at the corner of

Livonia and Sheffield Avenues under the distant, dark and obstructed conditions at issue.[24]  See

Shine, 2019 WL 2442145, at *3 (granting motion to suppress due to, inter alia, an officer's

testimony about primary stop justification which the officer had not mentioned in his earlier,

inconsistent grand jury testimony); Price, 2014 WL 558674, at *13 (disbelieving officer's

---

Vitale stopped Mr. Andrews suggest that he did not suspect that Mr. Andrews had retrieved a
firearm from his pants.  If Officer Schumacher had so suspected, it would have been logical for
him to provide Officer Vitale with direct and immediate backup instead of walking past him to
look for a discarded gun which Officer Schumacher testified he never saw Mr. Andrews drop,
particularly as there was no reasonable likelihood that anyone would retrieve such a weapon as
the street was otherwise empty except for the man with the mop bucket.

[24] The Government suggests that Officer Vitale's testimony about the dramatic motion is
corroborated by the fact that the firearm was ultimately found against Mr. Andrews's skin under
his pants and undergarments.  See ECF No. 94 at 14.  The Government's point about the
narrative utility of Officer Vitale's testimony about a hand motion he previously described as
more understated tends to undermine, not bolster, the Government's case.  See Price, 2014 WL
558674, at *12 (finding officer credibility impeached by, inter alia, "favorable embellishments in
an attempt to strengthen the government's narrative").

testimony that the defendant "numerous times . . . kept on touching that heavy object in [his]

pocket" because it was inconsistent with the officer's prior grand jury testimony that the

defendant "sort of touched" his pocket "at one point"); Kiyuyung, 1999 WL 435143, at *5

(declining to credit officer's testimony because his version of the facts "change[d] so drastically"

in a short period of time); People v. Miret-Gonzalez, 552 N.Y.S.2d 959, 961 (2d Dep't 1990)

(finding an officer's testimony unconvincing when it was contradicted by an incident report he

wrote on the day of the arrest).[25]   Third, Officer McCurry's testimony that he viewed Mr.

Andrews move his hand wrist deep into his waistband at a place and time that he could not

recollect with any specificity has no value because of its vagueness.[26]   Assuming, arguendo, that

Officer McCurry made the alleged observation from the same distant, dark and obstructed

vantage point as Officer Schumacher and Officer Vitale, the reliability of his testimony suffers

the same deficiencies as theirs.

      In addition to finding the Government's hand-motion evidence implausible, incredible or

---

[25] This Court notes, but rejects, the Government's argument that it should credit Officer Vitale's
version of Mr. Andrews's hand movement because it is corroborated by the fact that, when
Officer Vitale first stopped Mr. Andrews, Officer Vitale asked him what he had been doing
behind the wrought-iron fence.  See ECF No. 94 at 20; Exh. 2.2 at 1:19:00 (Vitale body-camera
footage).  The fact that Officer Vitale asked Mr. Andrews this question does not explain the
inconsistencies that impeached Officer Vitale's testimony.  Further, the fact that Officer Vitale
asked Mr. Andrews what he had been doing may tend to support what this Court finds, i.e., the
officers had not been able to observe anything because of distance, darkness and physical
obstructions in their view from the corner of Livonia and Sheffield Avenues.

[26] The Government argues that Officer McCurry's testimony that Mr. Andrews put his hand into
his pants "at least" wrist deep is consistent with Officer Vitale's because putting one's hand into
their pants up to their elbow is at least wrist deep.  See ECF No. 94 at 20.  Setting aside that the
Court finds that Officer McCurry's testimony is without sufficient time and place detail to credit
it, Officer McCurry's in-court demonstration of what he saw was that Mr. Andrews put his hand
in his pants to his wrist line.   Just as an inch is not a foot, a hand is not half an arm.  For similar
reasons the Government is incorrect that Officer Vitale's testimony and demonstration that Mr.
Andrews's elbow-deep hand movement was consistent with a waistband adjustment.

just plain insufficient for the reasons discussed, the Government's hand-motion evidence is also insufficient because the officers testified that each could not recollect telling his colleagues about the alleged hand-motion observations prior to commencing the stop-and-frisk.  See Section I.b.viii, supra.  Officer Schumacher could not remember telling Officer Vitale or Officer McCurry that he thought Mr. Andrews might have a gun in his hand, see Tr. 122:13-123:1 (Schumacher); Officer Vitale could not remember telling Officer Schumacher or Officer McCurry that he thought Mr. Andrews might have a gun hidden in his pants, see Tr. 64:15-17 (Vitale); and Officer McCurry did not testify about telling anybody anything, see Section I.b.viii, supra.  In the absence of any evidence that the officers told one another about the alleged hand-motion allegations, the Government has not established that they did.  Yet, it defies logic that the officers would stop and frisk someone they suspected was armed while keeping each of their individual observations about the threat posed secret from one another.  Officer Schumacher testified that he may have "assumed that [the other officers had seen] the same thing" he did.  Tr. 138:16-22 (Schumacher).  Yet, this Court declines the Government's argument that it should believe that Officer Schumacher let Officer Vitale, who allegedly thought that Mr. Andrews had hidden a gun inside his pants, out of the car to stop Mr. Andrews while remaining "strangely (and dangerously) quiet about [the] extremely important fact" that Officer Schumacher allegedly believed that Mr. Andrews might be holding a gun in his hand.  See Mayo, 960 F. Supp. 2d at 423-24 ("No warning about a weapon was given because none of the law enforcement officers in the car knew or had reason to suspect [that the defendant] had a weapon.").

This Court notes that Mr. Andrews asks for an adverse inference in support of his suppression motion from the fact that the officers should have activated their body cameras sooner during the incident, particularly because Officer Schumacher and Officer Vitale have

both recently been cited by the CCRB for such failures in connection other incidents.  See ECF No. 96 at 30-31; Section I.b.xix, supra.  This is a factor to be considered because it is undisputed that the officers did not turn on their cameras until just before or after the stop.  See Sections I.b.xii, xvi, supra.  Officer Schumacher testified that an officer could activate his body camera in seconds with a swipe of its toggle switch.  See Section I.a.i, supra.  Common sense suggests that such facile activation is meant to minimally interrupt police work.  Officer Schumacher's testimony that he had not activated his camera sooner because he was driving and making observations does not explain why he could not have activated the camera by swiping it when the car stopped at the corner of Livonia and Sheffield Avenues, or at least when he was turning the car around to intercept Mr. Andrews.  See Section I.b.xvi, supra; United States v. Austin, No. 06 Crim. 991 (JSR), 2020 WL 6788068, at *2 (S.D.N.Y. Nov. 18, 2020) (finding the officer's explanation for why he did not turn on his body camera "troubling":  "Here we have an officer in the field, wearing a body camera, for the specific purpose of conducting drug investigations.  If he is not required to leave his body camera on, the result . . . is entirely predictable: the camera captures the aftermath . . . but not the main event.").  This same question hangs over Officer McCurry's explanation that it would not have been safe for him to activate his camera sooner given that he was a passenger in the car when making observations.  See Section I.b.xvi, supra.  Officer Vitale's explanation that he did not activate it sooner because the period prior to the stop was "just [the officers'] observations" misses the point, which is that had the officers activated their body cameras during the period of their surveillance of Mr. Andrews, the parties and the Court would know if the cameras picked up anything useful about the disputed observations that are at the heart of Mr. Andrews's motion.  See Section I.b.xii, supra; Tr. 72:7-18 (Vitale).  The Government's argument that the officers' body cameras would have been "unlikely" to visually

67

capture the disputed observations also misses the mark because, as Mr. Andrews notes, additional audio recording would have shed light on the officers' disputed bulge and hand-motion communications.  See ECF No. 94 at 22; ECF No. 96 at 30-31; Alleyne, 2021 WL 5496044, at *8 n.18 ("[I]t would have been the better practice to activate the audio function earlier in the encounter[.]").  Yet, because this Court finds the Government's evidence insufficient on the bulge and hand-motion allegations, it would be redundant to discredit the related testimony due to a failure to activate a body camera.[27]

In light of this Court's finding that the Government has failed to show by a preponderance of the evidence that the officers observed Mr. Andrews make hand motions distinctly consistent with the handling of a firearm or any one version of what the alleged hand motion specifically was, the allegation that Mr. Andrews made a hand motion is not a factor that contributes to the totality of the circumstances in this Court's reasonable-suspicion analysis.

---

[27] A different question is whether courts may draw any adverse evidentiary inferences from an officer's failure to gather additional video evidence from surveillance cameras in the vicinity of an incident that may have captured related facts.  On cross-examination, both Officer Schumacher and Officer Vitale testified that after Mr. Andrews's arrest, they did not check to see if there was any video footage of Mr. Andrews at the incident scene available from surveillance cameras such as those shown mounted on buildings near the intersection of Livonia and Pennsylvania Avenues in various photographs in evidence (which may or may not have been there on the date of the incident).  See Tr. 72:19-73:13 (Vitale), 165:23-170:3, 199:6-200:11 (Schumacher); Exhs. J.8-J.10, J.13.  Although Mr. Andrews has at least suggested that the officers' failure to collect such evidence is impeaching, no legal citation has been submitted in support of that proposition and the Court thus does not reach the question.  See, e.g., Walston v. City of New York, 289 F. Supp. 3d 398, 414 (E.D.N.Y. 2018) ("[C]ourts in this Circuit have expressly held that police do not have to review surveillance video in order to establish probable cause.").

    **c.**  **The Government's Evidence Shows By A Preponderance Of The Evidence That Mr. Andrews Slowed, Looked Around, Stopped And Walked Back Towards The Corner Of Livonia And Pennsylvania Avenues, But It Does Not Show By A Preponderance Of The Evidence That Mr. Andrews's Behavior Was Nervous Or Evasive**

The Government's evidence shows by a preponderance of the evidence that Mr. Andrews slowed down, looked around, stopped and walked back towards the corner of Livonia and Pennsylvania Avenues. The best evidence of Mr. Andrews slowing, looking around, stopping and walking back towards the corner of Livonia and Pennsylvania Avenues is the body-camera footage showing that when Officer Vitale approached Mr. Andrews, Mr. Andrews was stopped on the east side of the wrought-iron enclosures and looking towards Livonia and Pennsylvania Avenues in his interaction with Officer Vitale. See Exh. 2.2 at 1:18:55-1:19:01 (Vitale body-camera footage); Sections I.b.xiii-iv, supra.

Yet, the Government has failed to prove by a preponderance of the evidence that Mr. Andrews's actions exhibited nervous or evasive behavior. Officer Schumacher and Officer Vitale both testified that when Mr. Andrews stood against the roll-down gate he was very close to, if not right where it met, the wrought-iron enclosures. See Tr. 12:15-15:2 (Officer Vitale testifying from Exhibit 9 that Mr. Andrews was standing against the roll-down gate by the wrought-iron enclosures to the left of the black chair "where that would make a corner"), 118:17-119:8 (Officer Schumacher testifying from Exhibit 15 that Mr. Andrews was standing against the roll-down gate very close to the wrought-iron enclosures where the chair's shadow was cast). Yet, as noted above, body-camera footage shows a chair, shopping cart and other detritus occupying precisely this space. See Sections I.a.vi, I.b.vi, III.b, supra. Accordingly, the Government's evidence that Mr. Andrews was standing against the roll-down gate so close to and even flush with the wrought-iron enclosures—a peculiar position that appears meant to

suggest that he was nervously or evasively, and therefore suspiciously, hiding—is incredible and insufficient to establish the point.  In the face of this insufficiency and in the absence of the bulge and hand-motion allegations, this Court does not find the balance of Mr. Andrews's actions as described—stopping, looking around, standing at the building line, then walking back onto the sidewalk and back toward the corner—particularly nervous or evasive.  There is no evidence that Mr. Andrews did any of this hurriedly and, when Officer Vitale approached Mr. Andrews, Mr. Andrews stepped calmly to answer Officer Vitale and said that he was waiting for a cab as he gestured to his telephone which, under the totality of the circumstances, seems like it would have been reasonable to believe.  See Rivera, 543 F. Supp. 2d at 337 (noting evidence did not suggest that the defendant appeared nervous before the frisk: "[W]hen [the officer] approached [the defendant, the defendant] turned right around.").

This Court notes, but rejects, the Government's evidence and arguments that because Mr. Andrews may have noticed the officers' car, it was objectively reasonable to suspect that Mr. Andrews's actions were nervous and evasive ones.  The officers' car was unmarked and "any slow moving car . . . would have attracted a pedestrian's attention."  Doughty, 2008 WL 4308123, at *5.

**d.  The Government's Evidence Shows By A Preponderance Of The Evidence That The Incident Occurred At Night**

The Government's evidence shows by a preponderance of the evidence that the incident occurred at night.

The parties do not dispute that the Government has shown that the incident occurred at approximately 1:00 a.m.  See ECF No. 94 at 17.

70

IV.   **This Court Respectfully Recommends That The District Judge Find That The Stop-And-Frisk Violated Mr. Andrews's Fourth Amendment Rights And That The District Judge Grant Mr. Andrews's Motion To Suppress The Firearm Seized As Well As His Post-Arrest Statements**

In the event the District Judge adopts the proposed findings that the Government's evidence does not establish that Officer Schumacher observed a bulge in the front of Mr. Andrews's waistband, that the officers observed Mr. Andrews make a suspicious hand motion, that the officers communicated any shared information with each other, or that Mr. Andrews's behavior was nervous or evasive, what remains is this:

- Mr. Andrews slowed down, looked around, stopped and walked back to the corner of Livonia and Pennsylvania Avenues at night.

See Sections III.a-d, supra.  This Court respectfully recommends that the totality of those circumstances, when viewed through the eyes of a reasonable and cautious officer on the scene, did not give rise to a reasonable suspicion that Mr. Andrews had a weapon, and therefore the stop-and-frisk violated Mr. Andrews's Fourth Amendment rights.  See Doughty, 2008 WL 4308123, at *4 (finding that there was nothing inherently unreasonable in the defendant's being outside where he was at night given evidence that at least one nearby store was open).  If the District Judge adopts this Court's recommendation that the stop-and-frisk was a violation of Mr. Andrews's Fourth Amendment rights, this Court also respectfully recommends that the District Judge grant Mr. Andrews's motion to suppress the firearm seized during the frisk as well as Mr. Andrews's post-arrest statements.  The Government has not argued that Mr. Andrews's post-arrest statements were purged of the taint of the Fourth Amendment violation other than its fleeting reference to Miranda warnings, which alone and per se are insufficient to show meaningful attention.  See Section I.b.xviii, supra; Kaupp, 538 U.S. at 633; Hiruko, 320 F. Supp. 2d at 35.  Even if the Government had attempted to offer other purgation arguments, the

71

discredited officer testimony raises such serious concerns about truthfulness as to events of such central importance, the flagrancy of the Fourth Amendment violation is a factor weighing against a finding of attenuation that the Government would have had to overcome.  See Kaupp, 538 U.S. at 633.

## V.     Conclusion

For the reasons set forth above, I respectfully recommend that the Court grant in full Mr. Andrews's motion to suppress the firearm and his post-arrest statements on the ground that the Government has failed to establish by a preponderance of the evidence that the officers had a reasonable suspicion for the stop and frisk of Mr. Andrews.  See ECF No. 14.

## VI.    Objections

These proposed findings of fact and recommendation will be filed on the Court's ECF system today and is therefore deemed served on the parties as of today's date.  Any objections to this report and recommendation must be filed with the Clerk of the Court within fourteen days of today's date.  Failure to file objections within that period will waive the right to appeal the District Court's order.  See 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(2).

Dated:  Brooklyn, New York
         April 1, 2022

*Vera M. Scanlon*
VERA M. SCANLON
United States Magistrate Judge